**LOCAL NO. 1 (ACA), BROADCAST EMPLOYEES OF the INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, et al.**

v.

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, et al.**

Civ. A. No. 75–2684.

United States District Court,
E. D. Pennsylvania.

June 21, 1976.

As Amended Aug. 12, 1976.

Harry Lore, Philadelphia, Pa., for plaintiffs.

Robert Baptiste, Barry Wm. Levine, Washington, D. C., Edward Davis, Philadelphia, Pa., for IBT, Fitzsimmons and Nangle.

Edward McIntyre, Philadelphia, Pa., for Local 107, Bottone and Smalley.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

The plaintiffs in this action seek to enjoin the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("IBT") from implementing an Order of the IBT General Executive Board ("GEB") directing the merger of the plaintiff, Local No. 1 (ACA) Broadcast Employees of the IBT ("Local 1"), into IBT Local 107. William Bender, Local 1's Secretary-Treasurer and principal protagonist,

and Morton Borrow, Walter Jost, and Anthony Evasew, members of Local 1's Executive Board, have joined Local 1 as parties plaintiff, and together they have marshaled a potpourri of legal theories to assault the order of merger.

Plaintiffs' first category of attack is in a conventional labor law mold and includes allegations that: (1) the merger was improperly authorized by the GEB, in violation of accepted trade union principles and in breach of the fiduciary duty of the IBT to its local affiliates under § 501(b) of the Labor-Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. § 501(b) (1970); (2) the IBT should have conducted a referendum of the local unions involved before effecting the merger; (3) the merger order was effected arbitrarily, without due process of law and in violation of the Labor Management Relations Act, 29 U.S.C. §§ 141–187 (1970); (4) the terms of the merger order are onerous to Local 1 and invalid; (5) the IBT constitutional provision authorizing merger of subordinate bodies violates general principles of labor law and the U.S. Constitution; and (6) the order of merger breaches the contract under which Local 1 became an IBT affiliate.

As wide ranging as the foregoing allegations may be, they constitute the lesser part of plaintiffs' arsenal. The principal thrust of their claim lies in the allegation that even if the GEB had possessed and properly exercised the power to order the merger, its employment in the circumstances of this case was an act of unlawful retaliation by the IBT's General President, Frank E. Fitzsimmons and the GEB: (1) for plaintiffs' refusal to join with the IBT in its support of President Nixon for re-election in 1972; and (2) for plaintiffs' support of former IBT General President James R. Hoffa evidenced, *inter alia,* by the joinder of Local 1 as a party plaintiff in the case of *Hoffa et al. v. Saxbe et al.* in the United States District Court for the District of Columbia, 378 F.Supp. 1221. The *Hoffa v. Saxbe* plaintiffs alleged that the commutation restrictions upon Hoffa's release from prison were illegal and the product of a conspir-

acy, including Fitzsimmons and White House officials, to prevent Hoffa from challenging Fitzsimmons as General President of the IBT. Plaintiff's "retaliation" claims are appended to a variety of legal labels: the Civil Rights Acts, 42 U.S.C. §§ 1983 and 1985 (1970); the First, Fifth and Fourteenth Amendments to the United States Constitution; and the Bill of Rights sections of the LMRDA, 29 U.S.C. §§ 411–415, 529 (1970).

This opinion principally addresses plaintiffs' application for a preliminary injunction and follows an extensive hearing thereon (lasting four days). However, the opinion also explicates the bases for our rulings upon a number of prehearing motions under Fed.R.Civ.P. 12. These rulings resulted in (1) the dismissal as parties defendant of Local 107, Louis J. Bottone and John E. Smalley, president and business agent respectively of Local 107, and IBT General President Fitzsimmons and IBT Vice President Edward Nangle; (2) the dismissal of the substantive counts alleging violations of 42 U.S.C. § 1983 and the First, Fifth and Fourteenth Amendments for failure to implicate state action; and (3) the rejection of defendants' contention that the present suit was barred under the doctrine of *res judicata* because of the dismissal of a prior state court action brought by Local 1 seeking to enjoin an IBT-ordered merger of Local 1 with IBT Local 115. (As will be seen, the merger with Local 115 was never implemented, and, in due course, Local 107 was substituted for Local 115 by order of the GEB.) We withheld (and still withhold) judgment on defendant's motion to dismiss the back salary claim of plaintiff Bender (Count Five) as failing to state a federal cause of action or to fall within the pendent

jurisdiction of this Court. A separate motion under Fed.R.Civ.P. 12(b)(6) to dismiss Count Two, the § 1985 claim, was filed later, and we also discuss that motion below.

The grounds upon which we dismissed the case against Bottone, Smalley, Nangle and Fitzsimmons, and dismissed all claims except Count Five against Local 107 were rudimentary and require but brief comment. There was no allegation in the complaint [1] that Local 107, Bottone or Smalley acted except in furtherance of the order of the GEB of IBT and as the IBT's agents, and it appeared that any relief sought against those parties would be subsumed within the ambit of Fed.R.Civ.P. 65, which authorizes the issuance of injunctive relief not only against parties defendant but also against their agents and those acting in concert with them.[2] Concomitantly, it appeared from the complaint that Fitzsimmons and Nangle[3] acted only in representative capacities for IBT and not individually.[4] Of the Rule 12 motions we thus discuss in any detail only the Civil Rights and LMRDA claims and the *res judicata* claim, after which we turn to the merits of the preliminary injunction hearing and make the required findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

The evidence developed at the hearing on the merits chronicled the history of the Local 1 merger, enabling us to draw conclusions as to its *raison d'etre* and validity. Helpful to these conclusions was testimony: (1) about the history of the relationship between the IBT and its American Communications Association Broadcast Division, of which Local 1 is a part; (2) about the unsuccessful odyssey of Bender and Local 1 in attempting to persuade the IBT ade-

---

1. The motions before us concerned plaintiff's original and (first) amended complaints. A second amended complaint has been tendered but not yet approved for filing. *See* Fed.R. Civ.P. 15. Both amended complaints include a pendent claim for back pay for plaintiff Bender, an issue not directly implicated in this preliminary proceeding.

2. After further reflection, we have concluded that this ruling was erroneous, but it has

proved harmless thus far. *See* Part IV.B.2. *infra* at n.22.

3. Nangle was an IBT Vice President by reason of his presidency of Teamsters Joint Council 53 which covered the Philadelphia area.

4. We now think this ruling was also improper but harmless, with respect to the charge of violation of 29 U.S.C. § 501. *See* Part III.B. *infra* at n.13.

quately to support its efforts to organize outside of its original area of jurisdiction, radio broadcast technicians, in which it had been singularly unsuccessful in recent years; (3) about Bender's support of the Hoffa cause and its impact *vel non* upon the merger decisions; and (4) about the IBT's merger policy respecting small local unions such as Local 1 (average membership for the eight year period prior to June 1975, under 53 members).

The preliminary injunction hearing was held in the wake of an expedited discovery period in which depositions of all key witnesses were taken and numerous interrogatories answered and documents produced. However, the parties were unable to stipulate that the matter be submitted to the Court as on final hearing. We assume that more discovery will be taken, and perhaps that discovery will enable plaintiffs to establish their entitlement to permanent relief. We have not hesitated to express to defendants' counsel our doubts as to the wisdom of the policy pursued by the IBT concerning the Local 1 merger. However, a legal not a policy matter is before us, and, on the preliminary injunction record, we find that plaintiffs have not demonstrated the probability of their success on any theory of the case. On the contrary, the preliminary hearing record showed a uniformly and neutrally enforced IBT policy to merge smaller, weaker locals into stronger units. Hence, the application for preliminary relief must be denied.

We came to the conclusion that the plaintiffs' application for preliminary relief had to be denied after review of the parties' proposed findings of fact and conclusions of law and post-trial briefs. At that time, however, we were in the midst of an inordinate siege of protracted, specially listed trials (indeed, we were on trial almost continuously for five and one-half months) and

did not have the time to prepare this opinion which we knew would have to be long and conceptually somewhat involved. Accordingly, on March 26, 1976, we entered the following order:

> AND NOW, this 26th day of March, 1976, after hearing and in consideration of an extensive· opinion, incorporating findings of fact and conclusions of law, now in preparation and soon to follow, IT IS ORDERED that plaintiffs' motion for a preliminary injunction is DENIED.

In a footnote to the order we noted our inability to file an opinion containing findings of fact and conclusions of law by that time and added:

> This order recites the end result of the opinion in process. We file this order at this time because we find that further delay of this order to accommodate preparation of the findings and conclusions required by Fed.R.Civ.P. 52(a) would unduly burden the parties, aggravate uncertainty as to legal rights and positions, and generally disserve the ends of justice in this case.[5]

This opinion constitutes those findings of fact and conclusions of law.[6]

## II. *Res Judicata*

The defendants strongly asserted from the very beginning of this case that we should grant them summary judgment on the ground that the action was precluded as *res judicata*. In support of this motion, IBT filed a certified copy of the record in *Local 1, IBT (ACA), et al. v. IBT, et al.,* Eq. No. 3179, June Term, 1974 (C.P., Phila., filed June 18, 1974), *dismissed on the pleadings* (Dec. 31, 1974), *plaintiffs' petition to open or strike judgment on the pleadings denied* (April 15, 1975). After examining the record in that case in the light of applicable principles of· Pennsylvania law, we

---

**5.** Following entry of the order, plaintiffs filed an appeal with the United States Court of Appeals for the Third Circuit, No. 76–1698. In the order appended to this opinion, we direct the Clerk to file this opinion and to certify it to the Clerk of the Court of Appeals as a supplement to the record.

**6.** *Cf. San Filippo v. United Bhd. of Carpenters,* 525 F.2d 508, 511 (2d Cir. 1975) (district court failed to make findings when denying preliminary injunction against merger of local unions).

concluded that the present federal action was not barred.[7]

At first blush, the *res judicata* argument seems compelling. The complaint in the Common Pleas equity action is essentially identical to that filed here, except that it focused exclusively on IBT's earlier, aborted plan to merge Local 1 into Local 115, another Philadelphia-area affiliate. This federal action includes those same facts and brings the story up to date by including the Local 107 episode. The causes of action asserted are also the same: violations of 42 U.S.C. § 1985, the due process clause, the LMRDA, and Local 1's Teamster charter. The federal complaint only adds references to the First Amendment and § 1983, and adds a count claiming back pay for plaintiff Bender. Substantial identity of the two actions, however, only begins the inquiry.

■ The Federal Res Judicata Act, implementing the Full Faith and Credit Clause of Article IV, § 1 of the Constitution, requires us to give this state court judgment "the same full faith and credit . . . as [it has] by law or usage in the courts of [the] State" in which it was rendered. 28 U.S.C. § 1738 (1970). Accordingly, we look to Pennsylvania law to determine the legal effect of the Common Pleas dismissal. See *Williams v. Murdoch,* 330 F.2d 745, 749–52 (3d Cir. 1964); *Porter v. Nossen,* 360 F.Supp. 527, 529 (M.D.Pa.1973). It is clear that a judgment on the pleadings in a Pennsylvania equity action is a final judgment, *Chudnoff v. Ipco Hospital Supply Corp.,* 450 Pa. 267, 299 A.2d 626 (1973), but the *res judicata* effect to which it is entitled depends on whether that final judgment was an adjudication of the merits. See *Zimmer v. Zimmer,* 457 Pa. 488, 326 A.2d 318, 320 (1974). The reason is clear: a judgment for the defendant in equity may be based entirely on the court's determination that one of the prerequisites for extraordinary, equitable relief, such as imminent, irreparable injury, or absence of an adequate remedy at law, is lacking. *Porter v. Nossen, supra,* 360 F.Supp. at 530 & nn.21–23, *citing* Pennsylvania cases and *Restatement of Judgments* § 65(2), at 271 (1942) and *id.,* comment (i), at 278. Where the Chancellor fails to articulate the precise basis of the dismissal, leaving open the possibility of an adjudication not on the merits, the judgment cannot be treated as *res judicata.* See *Williams v. Murdoch, supra,* 330 F.2d at 755.

■ In the case between Local 1 and IBT in the Court of Common Pleas, defendants filed a motion for judgment on the pleadings, together with a brief arguing six grounds for the granting of their motion. Plaintiffs failed to answer the motion, and the court therefore deemed it uncontested. The December 31, 1974, order of Judge Ned L. Hirsh which granted the motion to dismiss and upon which defendants now rely, reads in operative part: "the court, upon consideration of the Defendants['] Motion for Judgment on the Pleadings . . . hereby enters Judgment for the Defendants and orders that the Plaintiffs' Complaint in equity be hereby dismissed." No memorandum or other explanation of the grounds for this order appears in the record.[8] The possibility is as likely as any other that Judge Hirsh based his ruling on Point Six of the defendants' brief, headed "The Plaintiff Union Is Seeking a Summary and Extraordinary Remedy Without a Pro[p]er Showing of a Right to this Remedy." In essence, they argued:

> that an injunction . . . should not be granted except to prevent substantial and irreparable harm. What rights are affected by the merger of the plaintiff Union with another affiliate? The Complaint shows none. . . . There exists no justification . . . for . . . injunctive relief.

Defendants['] Brief in Support of Motion for Judgment on the Pleadings, *Local 1, IBT (ACA) et al. v. IBT et al.,* Eq. No. 3179,

---

7. If we were wrong in so ruling, of course, this entire case would be permanently resolved in defendants' favor. Accordingly, we explain the *res judicata* ruling in some detail.

8. On March 14, 1975, plaintiffs filed a Petition to Open Judgment, which was denied, also without explanation, on April 15, 1975.

June Term 1974, (C.P., Phila.), at 10–11. Such considerations as these are inextricably tied to the facts appearing at the time when the injunction is sought. For that reason, a ruling of a state court a full year ago that the threatened harm was then neither "substantial" nor "irreparable" would not bind us here and now, where significantly different and more recent facts have been alleged. See *Ammond v. McGahn,* 532 F.2d 325, 329 (3d Cir. 1976); *Chase v. Rieve,* 90 F.Supp. 184, 186 n.1 (S.D.N.Y.1950) (Rifkind, J.).

█ Since the record does not reveal the precise basis of Judge Hirsh's decision, this action is not barred by the doctrine of *res judicata,* and we are obliged to consider all the issues raised by the motion for a preliminary injunction.

## III. *The Applicability to this Case of the LMRDA*

### A. *Local 1's Standing and IBT's Capacity as Defendant*

The plaintiffs have alleged that IBT's attempt to merge Local 1 into Local 107 amounts to retaliation for the plaintiffs' expression of views in opposition to President Nixon's 1972 candidacy and in support of James R. Hoffa and for their participation as plaintiffs in *Hoffa v. Saxbe, supra.* They also characterize the merger as an improper disciplinary action. The plaintiffs have invoked the protections of 29 U.S.C. §§ 411(a)(2), (4) and (5) and § 529 (1970), parts of what is commonly known as Labor's Bill of Rights. Labor's Bill of Rights, which is § 101 of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), protects certain enumerated rights of "[e]very member" against infringement by any "labor organization." The IBT's trial brief disputes the applicability of the LMRDA to this case, and we must therefore determine whether the plaintiffs' claims come within the coverage of this Act.

There is a legitimate question whether the Act applies to a claim asserted by a local against an international union. Section 3 of the LMRDA, 29 U.S.C. § 402 (1970), defines "member," when "used in reference to a labor organization," as including "any person who has fulfilled the requirements for membership . . . ." 29 U.S.C. § 402(*o*). The term "membership" is not defined; to that extent, the definition is no more than a tautology. "Person," however, *is* defined; it includes, *inter alia,* "labor organizations." *Id.* § 402 (d). Is Local 1 a "member" of the IBT?

A "labor organization" under the LMRDA "includes any organization of any kind . . . in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning . . . terms or conditions of employment." *Id.* § 402(i). It also includes "any conference, general committee, . . . or joint council . . . which is subordinate to a[n] . . . international labor organization. . . ." *Id.* Only labor organizations in industries "affecting commerce" are covered; *id.*; and a labor organization is "deemed to be engaged" in such an industry if it is an "international labor organization or a local labor organization recognized or acting as the representative of employees" in such an industry. *Id.* § 402(j)(2).

Two questions arose from this welter of definitions which we had to resolve in order to decide how (or whether) to apply the LMRDA to this case: (1) whether the IBT is a "labor organization" obliged to obey Labor's Bill of Rights with respect to its "members"; and, if so, (2) whether Local 1 itself is a "member" of the IBT.

█ Because § 402(i), in part, specifically defines a "labor organization" to include entities larger than locals *but smaller than* an "international labor organization," a forceful argument could be made—if that language stood alone—that IBT as such is not bound by the prescriptions of the LMRDA. However, this clause of § 402(i) could also be intended not to exclude internationals from coverage, but only to ensure the inclusion of conferences and joint councils. This latter, more expansive reading is supported by § 402(j)(2), which brings with-

272

in the scope of the act those labor organizations engaged in industries "affecting commerce." Under that subsection a labor organization is "deemed" to be so engaged, and thus covered, if it is an "international labor organization." This subsection thus suggests that an international is within § 402(i) as well. Moreover, the exclusion of internationals would have been inconsistent with one of the primary Congressional purposes of LMRDA: broad protection of individual workers from abuse of their rights by their representatives in organized labor. *See* 29 U.S.C. § 401(b) (1970); *Hall v. Cole,* 412 U.S. 1, 7–8, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973). For all these reasons, we concluded that IBT is governed by the LMRDA in actions taken with respect to its "members."

■ The second question, then, was whether Local 1 itself is a "member" of the IBT under LMRDA. (There can be no doubt that the individual plaintiffs are members.) As recounted above, the statute defines a "member" as a "person," and a "person" includes a local "labor organization." 29 U.S.C. §§ 402(*o*), (d), (i) (1970). Within this framework the IBT cannot successfully maintain the proposition that Local 1 is not a member of the IBT or that it has not "fulfilled the requirements for membership" in the IBT, for the IBT argues in this case that it has the power to merge Local 1 because of its subordinate status. The parties have cited no authority holding—or denying—that a local can be a "member" of its international under the LMRDA Bill of Rights, and we have found none. But our conclusion that Local 1 itself is a "member" of the IBT gains support from decisions holding that a labor organization is a "person" with standing to sue under 29 U.S.C. § 412, the same jurisdictional base invoked here. *IBEW Local 336 v. Illinois Bell Telephone Co.,* 496 F.2d 1, 2–3 (7th Cir. 1974) (local); *International Union, UAW v. National Right to Work LDEF, Inc.,* 366 F.Supp. 46 (D.D.C. 1974) (international). Other district courts, including one affirmed by the Third Circuit, have resolved suits very much like this one, on their merits, without comment on the

local's standing to assert Bill of Rights issues. See *United Bhd. of Carpenters Local 853 v. United Bhd. of Carpenters,* 83 LRRM 2759 (D.N.J.1972), *aff'd mem.,* 480 F.2d 919 (3d Cir. 1973); *Strong v. Sheet Metal Workers Int'l Assn.,* 90 LRRM 2795 (N.D.Cal. 1974). We therefore concluded that Local 1 and its officers may properly sue to protect the LMRDA rights of themselves and their members.

*B. Would the Acts Alleged in the Complaint Violate Labor's Bill of Rights?*

■ The allegations of this complaint raise issues under §§ 101(a)(2), (4), (5) and 609 of the LMRDA, 29 U.S.C. §§ 411(a)(2), (4), (5) and 529 (1970). Subsection (a)(2) secures to members of labor organizations the right to freedom of expression, and subsection (a)(4) declares that labor organizations may not limit the right of their members to sue in any court. Subsection (a)(5) establishes a right to procedural due process in union disciplinary proceedings, and section 609 (29 U.S.C. § 529) prohibits labor organizations from taking any disciplinary action against a member for exercising any of these protected rights. Jurisdiction over a civil action to enforce these rights is granted by § 102 of the Act, 29 U.S.C. § 412. It is clear that the complaint states a claim upon which relief might be granted as to subsections (a)(2) and (a)(4), guaranteeing freedom of expression and the right to sue. However, the references to union discipline in subsection (a)(5) and § 609 create certain problems.

Defendant IBT contends that a merger is not "discipline" under these provisions if it is ordered "as a matter of policy." *Scovile v. Watson,* 338 F.2d 678, 680 (7th Cir. 1964), *cert. denied,* 380 U.S. 963, 85 S.Ct. 1107, 14 L.Ed.2d 154 (1965). Although no motion to dismiss the LMRDA count was filed, IBT does not appear to concede that a merger order inspired by the free speech or litigation activities of a local or its members could constitute "discipline." Local 1 on the other hand, claims that a facially valid but invidiously motivated merger order would be within the prohibitions of the Act,

pointing to *Scofield v. NLRB,* 394 U.S. 423, 430, 89 S.Ct. 1154, 22 L.Ed.2d 385 (1969) (discriminatory or unfair enforcement of properly adopted and facially valid union rule may be unfair labor practice), and *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) (procedurally regular alteration of city limits is invalid if intended to effect racial discrimination).

██ In *Carpenters Local 853 v. United Bhd. of Carpenters,* 83 LRRM 2759 (D.N.J. 1972), aff'd mem., 480 F.2d 919 (3d Cir. 1973),[9] an LMRDA merger case, the court held that an international's order of consolidation, followed by revocation of the local's charter for refusal to comply, was not "discipline" within the meaning of 29 U.S.C. § 411(a)(5).[10] Although the international's actions followed charges that the local was overtaxing its members, unable to support its business manager, and inadequately serving its jurisdiction, all because of its small size, the local was afforded no prior opportunity to be heard by the Executive Board. The court examined the effect of the consolidation and charter revocation on the local's membership and found no adverse impact, only benefits. It concluded that the LMRDA was not meant to "guarantee the perpetuity of a given local union. . . . [Subsection (a)(5)] merely precludes . . . dissolution [of a local] without due process when to do so would mean that the local has been substantively disciplined." 83 LRRM at 2765. Mere dilution of individual members' voting power was not enough. *Id.* Accord, *Strong v. Sheet Metal Workers,* 90 LRRM 2795 (N.D. Cal.1974). The *Carpenters* case, however, involved no allegation of invidious motivation, and the court expressly left open the question whether "motive is irrelevant if the motive is evil." *Id.* at 2764 n.7. That, of course, is the central LMRDA issue presented by the allegations of Local 1's complaint in this case.

██ We agree with the *Carpenters* case that a merger is not *per se* of the same nature as a fine, suspension or expulsion, which are expressly listed as examples of "discipline" in subsection (a)(5). A local extinguished by merger has not necessarily been "otherwise disciplined" so as to require the due process protections of that provision. But the focus of § 609 is entirely different. See *Grand Lodge of Int'l Ass'n of Machinists v. King,* 335 F.2d 340 (9th Cir.), cert. denied, 379 U.S. 920, 85 S.Ct. 274, 13 L.Ed.2d 334 (1964), noted with approval in *Lewis v. American Fed. of S. C. & M. Employees,* 407 F.2d 1185, 1188 n.4 (3d Cir. 1969).[11] That provision is violated when a union penalizes exercise of a right protected by § 101. Invidious motive is the entire target of § 609.[12] See *Sipe v. Local 191, United Bhd. of Carpenters,* 393 F.Supp. 865, 868–69 n.3 (M.D.Pa. 1975) (Sheridan, C. J.). If the allegations in the complaint are

---

**9.** The Court of Appeals' unpublished judgment order refers with seeming approval to the district court opinion. No. 73–1053 (June 22, 1973), at 2. We recognize, however, that judgment orders are not precedential, and that the summary affirmance did not transform the district court opinion into the law of the circuit. See *In re Reading Co. (Appeal of ICC),* 524 F.2d 324, 326 n.1 (3d Cir. 1975).

**10.** The *Carpenters* case does not appear to have involved a claim under § 609.

**11.** *But cf. Sheridan v. United Bhd. of Carpenters, Local 626,* 306 F.2d 152 (3d Cir. 1962); *Wood v. Dennis,* 489 F.2d 849, 857–58 (7th Cir. 1973) (Stevens, J., concurring), cert. denied, 415 U.S. 960, 94 S.Ct. 1490, 39 L.Ed.2d 575 (1974). *See also Harrison v. Local 54, AFSCME,* 518 F.2d 1276 (3d Cir. 1975); *Semancik v. UMW Dist. 5,* 466 F.2d 144 (3d Cir. 1972); *Martire v. Laborers' Local 1058,* 410 F.2d 32 (3d Cir.), cert. denied, 396 U.S. 903, 90 S.Ct. 216, 24 L.Ed.2d 179 (1969).

**12.** The importance of motive in proving a violation of § 609 has led to a somewhat academic debate regarding the proper treatment of conspiracy allegations in a private LMRDA suit. See *Abrams v. Carrier Corp.,* 434 F.2d 1234, 1253–54 (2d Cir. 1970), cert. denied, 401 U.S. 1009, 91 S.Ct. 1253, 28 L.Ed.2d 545 (1971). *Compare Cole v. Hall,* 35 F.R.D. 4, 8 (E.D.N.Y. 1964) (no § 412 cause of action for conspiracy), aff'd on two other grounds, 339 F.2d 881 (2d Cir. 1965), and 462 F.2d 777 (2d Cir. 1972), aff'd, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973); with *Gleason v. Chain Service Restaurant Local 11,* 300 F.Supp. 1241, 1258–59 (S.D. N.Y.1969), aff'd on other grounds, 422 F.2d 342 (2d Cir. 1970).

proved, and the merger of Local 1 into Local 107 was intended to punish Local 1 for its free speech or litigation activities, § 609 *forbids* the merger and no "due process" question under § 101(a)(5) would be significant. Accordingly, we hold that Count Four (paragraphs 35 and 36) of the (first) amended complaint states a claim under 29 U.S.C. § 412' for violations of 29 U.S.C. § 529 as well as of §§ 411(a)(2) and (a)(4).

Finally, we address plaintiffs' claim that an invidiously motivated merger order would violate 29 U.S.C. § 501, the "fiduciary duty" provision of the LMRDA. This count states a claim as well, for in this circuit the § 501 duty is given a broad reading which extends beyond financial affairs to all the responsibilities of labor leaders in their official duties.[13] *Sabolsky v. Budzanoski,* 457 F.2d 1245 (3d Cir.), *cert. denied,* 409 U.S. 853, 93 S.Ct. 65, 34 L.Ed.2d 96 (1972); *Keck v. Employees Ind. Ass'n,* 387 F.Supp. 241, 250–51 (E.D.Pa.1974); *Highway Truck Drivers Local 107 v. Cohen,* 182 F.Supp. 608 (E.D.Pa.), *aff'd,* 284 F.2d 162 (3d Cir. 1960), *cert. denied,* 365 U.S. 833, 81 S.Ct. 747, 5 L.Ed.2d 744 (1961). *See generally* Note, *The Fiduciary Duty Under Section 501 of the LMRDA,* 75 Colum.L. Rev. 1189 (1975). However, while all categories of official duties are covered by § 501, the judicial charter under that section to interfere in policy decisions of labor leaders is narrow. Neither the fiduciary duty provision nor any other law authorizes a court to decide whether internal union decisions are right or wrong, wise or un-

wise. As we have had occasion to note in a not wholly dissimilar context:

> [A]bsent unreasonable and arbitrary action by the union, it is in the best interests of unions and their members to govern themselves, and therefore it would be improvident to substitute the "removed" and "untutored" judgment of the courts for that of union tribunals.

*Musicians Protective Local 274 v. American Fed. of Musicians,* 329 F.Supp. 1226, 1238 (E.D.Pa.1971). This principle will guide our general approach to this case.

IV. The Civil Rights Claims

A. *Section 1983*

We dismissed plaintiffs' claim under 42 U.S.C. § 1983 as to all defendants on a motion under Fed.R.Civ.P. 12(b)(6). The law is clear beyond cavil that only the action of a state officer or of a private person acting under color of authority of a *state,* and not of a private party as such or of a federal official, can give rise to a cause of action under that section of the Civil Rights Act. *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). Lacking any such allegations in the complaint, Count Three had to be dismissed.[14]

B. *Section 1985*

Plaintiffs alleged that the defendants engaged in a conspiracy to deprive them of "the equal protection of the laws, or of equal privileges and immunities under the laws," in violation of 42 U.S.C.

---

13. Section 501 applies to union officials personally, not to labor organizations themselves. *Sabolsky v. Budzanoski,* 457 F.2d 1245, 1249 (3d Cir.), *cert. denied,* 409 U.S. 853, 93 S.Ct. 65, 34 L.Ed.2d 96 (1972). For that reason, we were wrong to dismiss Fitzsimmons and Nangle personally under Fed.R.Civ.P. 12(b)(6). Because of the failure to prove bad motive, however, that error has proved harmless at this preliminary stage of the case.

14. The plaintiffs' direct constitutional due process claim under 28 U.S.C. § 1331, adverted to in the jurisdictional paragraph of the complaint but not seeming to form the basis of any Count,

must fail for the same reason. The Fourteenth Amendment only requires the *states* and those in concert with them to give notice and a fair hearing before depriving a person of "liberty" or "property." There is no such Fourteenth Amendment obligation applicable to the relationship of two labor organizations. Nor are there any factual allegations to support a connection between IBT and the *federal* government sufficient to sustain a direct claim under § 1331 and the Fifth Amendment, also referred to in the jurisdictional paragraph but not in any Count.

§ 1985(3), or to penalize them for their participation in *Hoffa v. Saxbe, supra,* in violation of 42 U.S.C. § 1985(2). The defendants did not attack this Count in their initial motions to dismiss, but after filing its Answer to the complaint, IBT moved to dismiss this count on a number of bases.[15] We now grant that motion, but on somewhat different grounds from those advanced by IBT.

Count Two of the (first) amended complaint charges in ¶ 32 that the:

actions of the defendants i[n] ordering a merger of Local 1 into Local 107 is [sic] an unlawful conspiracy in violation of the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1985, and was done [sic] with the purpose and intention of depriving plaintiffs of their rights to express views and positions contrary to those of the 'leadership' of I.B.T.

We believe this paragraph and the other averments to which it refers adequately plead a cause of action under either § 1985(2) or § 1985(3).[16]

### 1. *Section 1985(2)*

 If the IBT conspired to harm the plaintiffs in their "person or property" on account of their participation as parties in *Hoffa v. Saxbe* in the United States District Court for the District of Columbia, then they could recover under 42 U.S.C.

§ 1985(2).[17] The inherent Congressional power to fashion a tort remedy designed to protect participants in federal court actions against harm, whether of public or private origin, is indisputable. *Brawer v. Horowitz,* 535 F.2d 830, at 835–841 (3d Cir. 1976); *Pennsylvania v. Local 542, Int'l Union of Operating Engineers,* 347 F.Supp. 268, 286 (E.D.Pa.1972); *cf.* also *United States v. Pacelli,* 491 F.2d 1108, 1113–15 (2d Cir.), *cert. denied,* 419 U.S. 826, 95 S.Ct. 43, 42 L.Ed.2d 49 (1974) (criminal prosecution), and cases cited therein.

### 2. *Section 1985(3)*

 In general terms, § 1985(3) of Title 42 creates a cause of action in favor of any person who is a victim of a conspiracy, motivated by invidious discrimination, to deprive him of rights secured to him by a federal statute or constitutional provision against deprivation by the defendants sued. *Cohen v. Illinois Inst. of Technology,* 524 F.2d 818, 827–30 (7th Cir. 1975) (Stevens, J.), *cert. denied,* 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 187 (1976); *McLellan v. Mississippi Power & Light Co.,* 526 F.2d 870 (5th Cir. 1976); *Lopez v. Arrowhead Ranches,* 523 F.2d 924 (9th Cir. 1975); *Milner v. National School of Health Technology,* 409 F.Supp. 1389, 1394–95 (E.D.Pa. 1976). See generally *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971); *Phillips v. Trello,* 502 F.2d 1000, 1004–05 (3d Cir. 1974); *Richardson v. Mil-*

---

**15.** Defendants argued that (1) they had no "bad motive" to interfere with plaintiffs' free speech; (2) there could be no conspiracy because all the defendants were agents of "a single business entity"; (3) plaintiffs fail to allege a "class-based discrimination"; and (4) state action is a necessary element of a § 1985 claim premised on Fourteenth Amendment rights. Plaintiffs counter that state action is unnecessary, but that it may exist here anyway. Our treatment of these various contentions appears in the discussion and analysis which follows.

The IBT motion purports to be based on Fed.R.Civ.P. 12(b)(6), but such a motion cannot be filed after answering. Rule 12(b). We have therefore treated it as having been filed under Rule 12(c), seeking judgment on the pleadings on this Count for the defendant.

**16.** Plaintiff's principal object in this case is injunctive relief. The express language of

§ 1985 and of its usual jurisdictional predicate, 28 U.S.C. § 1343(1), seems to limit relief to damages. However, the cases hold that injunctive relief may be had in appropriate instances as well, with jurisdiction founded on 28 U.S.C. § 1343(4). *Action v. Gannon,* 450 F.2d 1227, 1237–38 (8th Cir. 1971) (*en banc*); *Freeman and Bass, P.A. v. New Jersey Comm'n of Investigation,* 359 F.Supp. 1053, 1059 (D.N.J.1973) (Garth, J.); *Pennsylvania v. Local 542, Int'l U. of Operating Engineers,* 347 F.Supp. 268, 290–91, 301–02 (E.D.Pa.1972) (Higginbotham, J.).

**17.** 42 U.S.C. § 1985(2), *inter alia,* creates a cause of action where two or more persons conspire to deter, by force, intimidation, or threat, any party in any U.S. court from attending or testifying to any pending matter, or to injure any person or his property on account of his having so attended or testified.

*ler,* 446 F.2d 1247 (3d Cir. 1971); *Pennsylvania v. Local 542, Int'l Union of Operating Engineers,* 347 F.Supp. 268 (E.D.Pa.1972). The first question we must ask in a § 1985(3) case under this analysis is what federally secured right of the plaintiffs has allegedly been invaded by this defendant.[18] The averments of ¶ 32 just quoted permit two constructions. Plaintiffs may be alleging that the conspiracy was directed solely at rights secured by the First and Fourteenth Amendments, purportedly including the right to oppose the IBT leadership. As noted in Part IV.A. *supra,* the Fourteenth Amendment as such applies only to *state* action, which is not even claimed to be involved here. Likewise, the First Amendment by its terms is limited to protection of speech against *governmental* interference. *Hudgens v. NLRB,* 424 U.S. 507, 96 S.Ct. 1029, 1036–37, 47 L.Ed.2d 196 (1976); *cf. Cohen v. Illinois Inst., supra,* 524 F.2d at 829–30 n.33.[19] Free speech in the internal labor context is an important statutory policy, but not a constitutional right. See, *e. g., Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974).[20] Whether Congress had power under § 5, the Enforcement Clause of the Fourteenth Amendment, to outlaw private conspiracies tending to interfere with free speech, especially outside the racial context, and, if so, whether it intended to exercise such power in enacting § 1985(3), are questions we need

not reach in this case. We need not reach them because ¶ 32 of the complaint may be read to allege a coextensive and less problematic § 1985(3) theory.

 We think the averments of ¶ 32 claim a conspiratorial deprivation, in violation of § 1985(3), of the "right to express views and positions contrary to those of the 'leadership' of I.B.T.," not merely as an example of a First Amendment right, but as a separate right at which the alleged conspiracy was aimed. We reach this conclusion because: (1) as the Supreme Court made clear in *Letter Carriers, supra,* free speech may be protected in the labor context by statute, independent of the First Amendment; and (2) there is a federal statute protecting such speech applicable in this case, *i. e.* Labor's Bill of Rights, § 101 of the LMRDA. *See* Part III.B. *supra.* The federally protected right element of a § 1985(3) claim is thus satisfied here. See *Milner v. National School, supra,* in which Chief Judge Lord upheld a § 1985(3) complaint on the basis that it charged an invidious conspiracy to invade rights protected by Title VII of the 1964 Civil Rights Act. 409 F.Supp. at 1395.

 The other elements required to state a § 1985(3) claim are a conspiracy and an invidiously discriminatory animus. Both are satisfied. Defendants may or may not be correct that an organization and its officers cannot as a matter of law be coconspirators,[21] but this argument does not fully

18. Judge Higginbotham's analysis of § 1985(3) in the *Operating Engineers* case was somewhat different, taking the approach that the Fourteenth Amendment's Enforcement Clause authorized Congress to outlaw private conspiracies to interfere with equal rights, without the necessity of finding some non-Fourteenth Amendment source of the right before constitutionally being able to reach private action. 347 F.Supp. at 291–97. We note that the *Operating Engineers* case arose in a racial context and that Judge Higginbotham carefully rested his holding on an alternative Thirteenth Amendment ground. Thus, whether his Fourteenth Amendment analysis is sound outside the racial context in which it was articulated we need not consider here, as explained in the text which follows. *See also Lopez v. Arrowhead Ranches,* 523 F.2d 924, 927–28 n.3 (9th Cir. 1975).

19. In *Cohen,* Judge (now Justice) Stevens left open the question whether the First Amendment is nonetheless entitled to special deference as a basis for a § 1985 action.

20. Such cases as *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 617–18, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), labor cases which rely on the First Amendment, are not contrary. They concern the degree to which pure speech may constitute a statutory unfair labor practice and thus be subject to governmental restriction, an issue in which the First Amendment is properly implicated.

21. The authorities are split. *See Beamon v. W. B. Saunders Co.,* 413 F.Supp. 1167 (E.D.Pa., filed April 27, 1976), where Judge Fullam marshaled the conflicting authorities, *id.* at n.11. For example, *compare Girard v. 94th St. &*

answer the allegations of the complaint. Plaintiffs allege an agreement between IBT and Local 107 to effect the merger. Specifically, paragraphs 20 and 23 of the (first) amended complaint adequately charge that agents of Local 107 took affirmative actions to implement the merger, with the intention of furthering its allegedly unlawful purpose.[22] These two groups of defendants are enough to constitute a conspiracy. We also think the complaint adequately alleges an "invidiously discriminatory animus," as that term is used in *Griffin,* 403 U.S. at 102, 91 S.Ct. 1790.[23] As we read the caselaw it would appear that, in equal protection terms, a distinction is "invidious" and thus unlawful if it adversely affects a traditionally disadvantaged group along "suspect" lines,[24] is insufficiently "rational" in light of the respective interests of each party,[25] or unnecessarily burdens free exercise of a "fundamental right."[26] Free speech is clearly fundamental to the national labor policy. Discriminatory action of a labor organization motivated by the content of speech would thus seem well within the *Griffin* rationale. See *Richardson v. Miller,* 446 F.2d 1247 (3d Cir. 1971); *Means v. Wilson,* 522 F.2d 833 (8th Cir. 1975), *cert. denied,* 434 U.S. 958, 96 S.Ct. 1436, 47 L.Ed.2d 364 (1976); *Glasson v. Louisville,* 518 F.2d 899 (6th Cir.) (McCree, J.), *cert. denied,* 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 258 (1975); *cf. Cohen v. Illinois Inst., supra,* 524 F.2d at 829–30 n.33. Thus,

Count Two alleges all the elements of a § 1985(3) claim.

### C. Conclusion

Having completed our preliminary discussion of the Rule 12 viability of the causes of action alleged in the complaint, we turn to the crucial issues on the preliminary injunction motion: whether plaintiffs have shown a threat of irreparable injury or a probability of success in proving a violation of 42 U.S.C. § 1985, the LMRDA or a depredation of their contractual rights under their IBT charter.

### V. Findings of Fact

### A. The Affiliation of the American Communications Association with the IBT

The American Communications Association (ACA) was a labor organization which pioneered in the representation of employees in the radio broadcast industry. In its heyday, the 1930's, it was the dominant force in the field. For example, at one time, Local 1, the plaintiff herein and an ACA component, represented virtually all the broadcast employees in Philadelphia. In time, however, two factors sealed the fate of the ACA. The first was the inroads of the International Brotherhood of Electrical Workers (IBEW) and the National Association of Broadcast Employees and Technicians (NABET), the latter having organized the employees of the NBC and ABC operated stations and successfully raided various

---

*Fifth Ave. Corp.,* 530 F.2d 66, 70–72 (2d Cir. 1976), petition for *cert. denied* 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 798 (1976) *with id.* at 73–75 (Oakes, J., dissenting), *and Rackin v. Univ. of Pennsylvania,* 386 F.Supp. 992, 1005–06 (E.D.Pa.1974). *Beamon* holds that the issue is an inappropriate one for a motion to dismiss, raising more an issue of fact than of law. *Accord, Dupree v. Hertz Corp.,* Civ. No. 76–218 (E.D.Pa., filed May 28, 1976).

22. Thus, we may have been wrong to dismiss the individual defendants associated with Local 107, potential coconspirators, from the case. At this stage of the proceedings, however, this error proves harmless in light of the findings of fact. We do not know if it will later be necessary or appropriate to reconsider those dismissals.

23. The term "animus" as used in the *Griffin* opinion seems to be synonymous with "motivation," a term employed interchangeably with it in the same paragraph. 403 U.S. at 102, 91 S.Ct. 1790; see also *id.* at n.10. We do not think the Supreme Court meant "animus" in its secondary sense of personal hostility or enmity. *Accord, Means v. Wilson,* 522 F.2d 833, 839–40 & n.5 (8th Cir. 1975) (*semble*), *cert. denied,* 434 U.S. 958, 96 S.Ct. 1436, 47 L.Ed.2d 364 (1976).

24. *See, e. g., Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ec. 2d 534 (1971).

25. *See, e. g., Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

26. *See, e. g., Memorial Hospital v. Maricopa County,* 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974).

ACA local unions.[27] The second factor was the dramatic automation of the broadcast industry, which drastically reduced the number of broadcast technicians. The ACA once had 35,000 members. When it lost over 3,500 members as the result of NEBET raids in the 1960's and was reduced to 2,500 members, it sought the protection of a larger organization.[28] In 1966, the ACA sought affiliation with the IBT.

At that time the ACA was composed of four local unions. The largest of the four, Local 10, headquartered in New York City, had approximately 1,900 members, most of whom were employees of RCA Global Communications and of French Cables, a wire service for the financial community. The second largest was Local 111; also located in New York, it had approximately 400 members, most of them Western Union employees. The third local, headquartered in San Francisco, was Local 9, which had approximately 250 to 300 members, mostly RCA Global Communications employees. Last came Local 1 with but 50 members, of whom only 21 were broadcast employees.[29]

Upon affiliation, the ACA became the American Communications Association, Communications Trade Division of the defendant IBT. Its local unions, pursuant to the terms of the affiliation agreement, were chartered as local unions of the IBT and affiliated with the ACA Trade Division. The ACA Division, after its affiliation, was slated to organize in the communications field, including network broadcast and television station technicians. The ACA/IBT affiliation agreement provides that "[t]he local unions of ACA shall retain their present jurisdiction." It also provides, "In any case of conflict between the ACA Constitution or Local Bylaws and the IBT Constitution, the IBT Constitution shall prevail." Local 1's IBT charter application was filed on November 2, 1966. Its signatories, including plaintiffs Borrow, Jost and Bender, pledged themselves "to be governed by the International Constitution." Local 1's charter was granted on November 15, 1966. The charter contract, signed on April 21, 1967, on behalf of Local 1 by plaintiff Borrow, its President, obligated Local 1 to "abide by the provisions of the International Constitution."

## B. Local 1: Its Membership, Operations, and Organizational Efforts

While there was some dispute as to the size of Local 1's membership, we find that in 1967, the first year following affiliation with the IBT, Local 1 had approximately 44 members. In 1968, it had approximately 45; in 1969, approximately 44; in 1970, approximately 48; in 1971, approximately 68; in 1972, approximately 43; in 1973, approximately 61; in 1974, approximately 52; and in 1975, approximately 61 until June of that year, when it increased to 115. The increase in 1975 was due to an organizing success in the insurance industry discussed below. Local 1 now represents 18 broadcast technicians in Philadelphia radio stations, and three in New York. The balance of Local 1's members are pressmen at a New Jersey newspaper and insurance adjusters employed in New York.

As we have indicated above, the ACA had fallen on hard times with respect to its efforts in the broadcast industry. Accordingly, plaintiff William Bender, the Secretary-Treasurer and principal organizer (as well as main figure) in Local 1, sought greener fields. Bender had become affiliated with ACA in 1946 as a union organizer. He later became Secretary-Treasurer of Local 1, but his main endeavors have been in the organizational field.[30] Bender is an

---

27. The International Association of Technical and State Employees also made inroads.

28. The ACA's problems were also attributable, in part, to its being one of the "leftwing unions" expelled from the CIO during the 1950's. Cf. ACA v. Douds, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925 (1950); United Electrical, etc. v. Herzog (ACA v. Herzog), 110 F.Supp. 220 (D.D.

C.1953); ACA v. Schauffler, 80 F.Supp. 400 (E.D.Pa.1948).

29. By way of contrast, in the early 1940's Local 1 had 900 members in 17 states.

30. After affiliation, Bender was hired as a General Organizer by the IBT. He was removed from that position in August 1968, when it was

exceptionally bright, articulate and resourceful man, with considerable talent for tract writing and stump speaking.

Some of Bender's ventures outside the broadcast field on behalf of Local 1 were in the communications industry. Following Local 1's affiliation with IBT, Bender attempted to organize certain NBC and ABC radio technician employees and secured signature cards from approximately half of the 3,000 employees involved. This organizing drive was ordered halted by defendant Fitzsimmons, who had second thoughts at that time about "raiding." In the spring of 1972, Bender attempted, without success, to organize circulation employees of the Philadelphia Bulletin. Moreover, prior to the attempt to merge Local 1 into Local 115, Bender was engaged in an extensive organizing campaign at Norcross Greeting Card Company in West Chester, Pennsylvania, involving approximately 700 workers. This effort likewise failed. In these latter instances Bender claimed that his failure to organize successfully was the result of inadequate financial support from the IBT and its Eastern Conference.

As early as 1967, Bender had sensed that a fertile field for organization lay in the insurance industry, in which the union movement had made but few inroads. With the consent of IBT Vice-President Joseph Treretola, who was (and is) also President of the Eastern Conference of Teamsters, Bender sought to organize casualty insurance adjusters of State Farm and Continental Insurance Companies and the Crum and Forster Group. This campaign required more than organizing activity; it also required extensive litigation, which Bender pursued for years through the U.S. Court of Appeals for the Second Circuit and the U.S. Supreme Court.[31] The litigation was ultimately successful, and Bender succeeded in organizing a small number of State Farm and Continental employees in Nassau and Suffolk Counties of New York who became members of Local 1.

Bender's success in the insurance industry was publicly commended in March 1973 by General President Fitzsimmons as a "breakthrough." Then, as now, the two million members of the IBT were predominantly drivers and warehousemen, though the International has some degree of diversity in the industrial and white collar fields. The affiliation of the Brewery Workers Union in 1973 typified the diversification trend. However, the testimony on this subject reflected to us an ambivalence on the part of the IBT and its General President Fitzsimmons as to whether to pursue diversification, at least into the insurance industry, in view of the sizeable commitment of funds and personnel that a large campaign there would entail. Whether the ambivalence was a function of the widely publicized internal problems of the IBT or of a deeper philosophical dialogue as to the destiny of the IBT we cannot say. In any event, Bender's initial insurance industry successes resulted in only a minuscule increase in Local 1's membership, and the IBT has elected not to commit any significant resources to organizing the insurance industry. As a result, Bender's initiative has come virtually to naught.

In the wake of these developments, Local 1 has remained a tiny local union whose resources are as limited as its membership. Local 1 had been in poor financial condition since affiliation. It had no paid employees between November 1966 and May 1971. Although Local 1 paid plaintiff Bender a salary from May 1971 to December 1971, it was not able to continue these payments and has had no paid full-time representative since that time. It owes the Eastern Conference of Teamsters money for printing authorization cards, a debt it has been

determined that the ACA Trade Division could not support both of its general organizers, Bender and Joseph Selly, Director of the Division. Bender remained as Secretary-Treasurer of the ACA Trade Division.

**31.** *See e. g., Continental Ins. Co. v. NLRB,* 495 F.2d 44 (2d Cir. 1974), *Id.,* 409 F.2d 727 (2d Cir.), *cert. denied,* 396 U.S. 902, 90 S.Ct. 215, 24 L.Ed.2d 178 (1969).

unable to pay since incurred in 1972. It had assets in 1972 of approximately $1,000.[32]

Local 1's shortcomings have not been only financial. The local has also suffered from a bifurcation of its internal operations, a tale of two cities, as it were. For, while the local's office is in Philadelphia, most of its members, including Bender, live and work in metropolitan New York. Local 1 has failed to hold monthly membership meetings as required by the IBT Constitution Art. XIV, § 2(a)(1), probably for that reason, and its executive board meetings were held in a strange way: two members would meet in Philadelphia one day and three in New York the next (with Bender). Moreover, an audit report prepared for the IBT showed, *inter alia,* that Local 1 failed to adopt bylaws, as required by the IBT Constitution, Art. XXII, § 1, and that the local was late in paying per capita sums due the IBT, the Eastern Conference, and the Joint Council, and in filing required trustee reports. These problems did not prevent Bender, a most dedicated man, from servicing the membership, and at no time has there been any complaint by members of Local 1 regarding servicing, negotiation of collective bargaining agreements, or the performance of duties by Bender. On the other hand, the local's viability is at best marginal, and, in view of its financial difficulties, it lacks the capacity effectively to organize its jurisdiction.

### C. The IBT Constitution and the Merger Power

Article IX, § 11, of the IBT Constitution provides:

#### Mergers

Section 11. The General Executive Board in its discretion shall have the power to merge Local Unions and other subordinate bodies under such terms and conditions and subject to such qualifications as the General Executive Board may determine, taking into consideration such circumstances as financial conditions, jurisdiction, location, and such other factors as appear appropriate in connection with the Local Unions and other subordinate bodies involved.

In this connection the General Executive Board may, in its discretion, conduct a referendum vote among all of the members of the Local Union or subordinate body, or of the members in any division, craft or place of employment, or under any specific contract or on other similar basis as the General Executive Board may determine. The result of such referendum, if conducted, shall be advisory only.

This provision was in effect at the time of the ACA/IBT affiliation. The GEB, which is empowered under this provision to make merger decisions, consists of fifteen Vice Presidents of the IBT.

### D. The GEB Policy on Mergers; The "Track Record" and the Fate of Small Local Unions in the IBT

The policy of the GEB on the subject of mergers was advanced through the testimony of Murray W. Miller, who was at the time of the hearing General Secretary and Treasurer of the IBT, hence the second ranking official in its hierarchy.[33] Based upon Miller's testimony we find that the

---

**32.** Members of Local 1 pay maximum dues of nine dollars per month. Of these nine dollars, Local 1 pays the Joint Council fifteen cents, the ACA division fifty cents, the Eastern Conference twenty-five cents, and the International $2.15 per member per month. After the per capita payments, Local 1 retains $5.95 per member per month. Based on a membership of 115, this would leave approximately $7,280 in Local 1's treasury per year to pay expenses and salaries. It is evident that even with the increased membership Local 1 could not maintain a full-time paid representative and would not be self-sustaining.

**33.** Miller became General Secretary-Treasurer in April 1972. Prior to that time (from 1957 to 1972) he was the Director of the Southern Conference of Teamsters, hence an IBT Vice President. His duties as Secretary-Treasurer encompassed the general administration of the IBT as far as ministerial duties are concerned, and he was responsible for all IBT property, records, files, GEB meeting minutes, investments and the supervision of auditors and out of work benefits.

following criteria govern merger decisions as a matter of policy: the size of the local, its financial condition, including ability to maintain a full-time paid representative to service the membership, ability to organize charter jurisdiction, overlapping jurisdiction, compliance with IBT requirements about adopting bylaws, holding regular monthly meetings, paying per capita tax, and filing monthly trustee reports and government forms, and whether the local's officers carry out their duties. These criteria have remained the same from 1957 until the present time, under both the Hoffa and the Fitzsimmons administrations. Since April 1972, approximately 100 mergers have occurred; since 1966, approximately 200.

During the course of the hearing, we requested counsel for IBT to supply us with details concerning mergers within the IBT during the decade from 1966 through 1975, spanning the Hoffa and Fitzsimmons administrations, as well as details regarding local unions indicated as having fewer than 200 members as of September 1975. Counsel did so in the form of comprehensive schedules, which were received as exhibits. These schedules corroborate Miller's testimony. They demonstrate that local unions within the IBT with declining membership or small membership resulting in financial instability, inability to adequately provide services for the membership, or inability to organize a jurisdiction have consistently been subject to merger in recent years. Many local unions thus merged had memberships far greater than Local 1. Moreover, from time to time local unions not in the plight just mentioned were nonetheless merged to consolidate jurisdictions and provide more adequate service for members.

The data regarding local unions with fewer than 200 members also corroborates Miller's testimony. With the exceptions of: (1) sixteen small locals representing workers at beet sugar plants in the West, an exception which proves the rule because

these locals have formed a council which hires a full time representative who travels the circuit to serve the membership; and (2) certain locals chartered to serve a single enterprise, there are no surviving local unions in the IBT nearly as small or in as poor financial circumstances as Local 1. Locals in such condition have either been merged into other locals or else they have been disaffiliated and their Charters returned.[34]

It is clear beyond peradventure that adherence to established IBT policy would have dictated the merger of Local 1 into a larger, financially viable local union.

### E. The Decision to Merge Local 1 and the Implementation of that Decision

In the latter part of 1972, General Secretary-Treasurer Miller began a review of local unions with memberships of under 100 to determine whether to recommend a merger. A review of the situation of Local 1 revealed its small membership and poor financial condition, its inability to maintain a full-time, paid representative, its late per capita payments, its failure to adopt bylaws, and its failure to hold regular monthly membership meetings. We credit Miller's testimony that it was he who initiated the merger proposal. In terms of formal developments, the following occurred. Miller, after review, discussed Local 1's situation with Joseph Treretola, Director of the Eastern Conference of Teamsters and a Vice President of the IBT. Miller next brought the matter to the attention of the GEB at one of its quarterly meetings, held on July 17–20, 1973. He recommended that Local 1 be merged because of its small size, poor financial condition, failure to adopt bylaws, failure to hold regular monthly meetings, inability to maintain a full-time paid representative, and lateness in per capita payments. At its session of July 18, 1973, the GEB voted unanimously in favor of merger of Local 1 into an appropriate

---

**34.** The only local union not within one of the noted exceptions even distantly approaching Local 1's situation is Local 658, representing creosote workers in Calgary, Alberta (Canada) with a membership of 164, but with assets of over $15,000. Moreover, that local is in a geographically remote area, and it represents only two bargaining units where its officers are also employed.

local union for the reasons advanced by Miller.

Implementation of the decision to merge Local 1 traveled a more troubled course. On July 27, 1973, Miller wrote Treretola, directing him to implement the Board decision by finding a local with which to merge Local 1. On November 28, 1973, Miller wrote Treretola again, requesting to be advised of the local union with which Local 1 was to be merged. It was of course logical to attempt to merge Local 1 with one of its sister ACA locals in New York, and accordingly Treretola and Joseph Selly, Director of the ACA Communications Trade Division and President of the ACA since 1940, discussed the merger with the leadership of ACA Locals 10 and 111, but they objected to merger with Local 1.

On April 1, 1974, Treretola wrote Miller that he was unable to find a local willing to merge with Local 1. On April 30, 1974, Treretola moved before the GEB to dissolve Local 1's charter, but then withdrew his motion. We credit Treretola's testimony that this motion was made solely because of difficulty in finding an accommodating local union into which Local 1 could merge. On May 2, 1974, the GEB voted to merge Locals 1 and 115.[35] Local 115 opposed this merger. Moreover, on June 18, 1974, Local 1 and William Bender filed suit in the Court of Common Pleas of Philadelphia County to enjoin the merger. Named as defendants were the IBT, Frank E. Fitzsimmons and Edward Nangle.[36] As we have noted above in our discussion of its alleged *res judicata* effect, this lawsuit was dismissed by the court on December 31, 1974.

On January 24, 1975, after the dismissal of the state court suit, the GEB reaffirmed its decision to proceed with the Local 1's merger. Bender was notified and directed to take certain steps to facilitate an orderly merger. Bender refused to comply. Thereafter, on March 4, 1975, Bender wrote to Miller to request a stay because of an organizing drive which Bender hoped would increase the size of Local 1. On March 17, 1975, Miller wrote to Bender that the request for a stay had been denied by the GEB because no substantial reason for changing its decision had been presented. At a GEB meeting held between April 28 and May 1, 1975, the GEB once again reaffirmed its decision. On July 7, 1975, Bender wrote Miller to suggest the organizing possibilities in the insurance industry, to no avail. The GEB reviewed its previous decisions, reviewed Bender's letter and position, and concluded that Local 1's recent "organizing success" did not substantially change the situation or affect the reasons for the original merger decision.

On July 8, 1975, the GEB ordered that the previous decision merging Local 1 with Local 115 be amended to substitute Local 107 for Local 115, and Fitzsimmons wrote to Bender on July 16, 1975, notifying him of this decision. Local 107 is a large Philadelphia based local, the vast bulk of whose members are truck drivers. Local 107's recent history has been marked by internal strife, its fabric frequently tattered by violence.[37] On July 21, 1975, Messrs. Cotter and Barlow, as representatives of the IBT, appeared in the office of Local 1 and demanded that Bender immediately turn over the local's charter, books, records, seal, bank accounts, membership lists, collective bargaining agreements, minutes, etc., and handed him two letters dated July 16, 1975, one from Murray W. Miller and the other from Frank E. Fitzsimmons. Bender continued to protest the merger. Local 107, which had a complete executive board, made no provision to include Bender thereon. On September 9, 1975, Louis J. Bot-

---

**35.** No notice was given to the affected locals, but none is required by the IBT's Constitution and Bylaws.

**36.** Nangle is President of Teamster Joint Council 53, which encompasses the Philadelphia area (and Local 1) within its jurisdiction. Nangle is also an IBT Vice President.

**37.** *See, e. g., Adley Express Co. v. Highway Truck Drivers, etc., Local 107*, 365 F.Supp. 769 (E.D.Pa.1973). Indeed, while the case at bar has been in progress, a suit over control of Local 107 was filed in state court, and there have been several changes of Local 107's counsel before us.

tone, President of Local 107, sent out formal notification to members of Local 1 informing those who were given notice that their membership obligations would thenceforth accrue to Local 107, "as the successor to Local 1." This notice was followed by a certified letter on September 17, 1975, from Bottone to Local 1's members containing dues checkoff forms, personal data sheets and a membership card in defendant Local 107 with the Local 1 member's name inscribed on it. These notices were prepared by the IBT for use by Bottone. Shortly thereafter the present lawsuit was filed.

### F. Bender, Former General President Hoffa, and the Hoffa Lawsuit

As we noted in our Preliminary Statement, the principal thesis of plaintiffs' case is that Local 1 was ordered merged into Local 107 in retaliation for its refusal to join with the IBT in its support of President Nixon for re-election in 1972, and for Local 1 and Bender's continuing support of former Teamsters General President James R. Hoffa. Deferring the question of motivation until the next section of this part of the opinion, there is no doubt about plaintiffs' underlying factual predicates. At the 1971 convention, Local 1 cast its single vote for Theodore Daley, Fitzsimmons' only challenger.[38] Bender has expressed his support for former Teamsters President Hoffa in a number of ways. In June 1971, Bender sent a telegram to the GEB and to the secretary-treasurer of the ACA asking them to nominate Hoffa, then in Lewisburg Prison, for the IBT general presidency.[39] On the third day of the convention, Bender moved that Hoffa's picture be brought into the convention hall from the lobby.

In 1972, the GEB endorsed then-President Nixon for re-election. In September 1972, at a meeting of Joint Council 53, of which Local 1 was a member, the majority of delegates also voted, without discussion, to endorse Nixon. Local 1 and others recorded their opposition to the motion.

After Hoffa's release from Lewisburg in December 1971, Bender frequently appeared at Hoffa testimonial dinners. Moreover, Local 1 joined as plaintiff in the lawsuit, *Hoffa v. Saxbe*, 378 F.Supp. 1221, filed March 13, 1974, in the United States District Court for the District of Columbia. That suit challenged the restrictions on Hoffa's union activities which were imposed as a condition of the commutation of his sentence, alleging that the commutation restrictions on Hoffa's release from prison were the illegal end product of a conspiracy, that included Fitzsimmons, to prevent Hoffa from challenging Fitzsimmons as General President of the IBT. At the time of the hearing in the District of Columbia on the Hoffa law suit, Bender was filmed with Hoffa, and this film was shown on network television. Similarly, at the time of the argument on appeal in the United States Court of Appeals for the District of Columbia, Bender was also with Hoffa, and their picture together again appeared on television.

### G. The Reasons for the Merger Order

We have already found, based on the evidence presented at the preliminary injunction hearing, that the merger of Local 1 was clearly indicated in terms of prevailing IBT policy under both the Hoffa and Fitzsimmons administrations. Such a finding does not dispose of plaintiffs' allegations as to the reasons for the merger; hence, we now analyze plaintiffs' contentions in light of the findings heretofore made, after which we will record our findings on the motivation issue.

Plaintiffs' case proceeds from the premises that the positions of Bender and Local 1 on the Nixon and Hoffa issues were well known to Fitzsimmons and the IBT leadership, and that steps toward merger, allegedly taken in proximity to salient anti-Nixon or pro-Hoffa statements of the plaintiffs, thus supply the causal nexus which estab-

---

**38.** Daley received but a handful of votes, and withdrew about a fourth of the way through the roll call.

**39.** Hoffa had entered Lewisburg on March 7, 1967.

lishes that the merger was intended to chill opposition to Fitzsimmons. We disagree with these premises and, in so doing, note our finding that Bender and Local 1 have, albeit understandably, exaggerated their own importance, even their own visibility on the IBT scene.

With respect to the 1971 Convention activities, General Secretary-Treasurer Miller, who initiated the merger proposal, testified that he was aware of the motion to move the Hoffa picture into the convention hall but did not associate the motion with Bender or Local 1. Nor was he aware that Bender had suggested that Hoffa be nominated. We credit that testimony. Indeed, Miller, the number two man in the IBT hierarchy, had only met Bender on one occasion prior to the preliminary injunction hearing, and that was a brief encounter. Miller did not know who Bender was at the time. Miller's initiation of the steps toward merger occurred over a year later, following a routine audit report. We do not believe that Miller had the convention Hoffa incident in mind at the time. While Local 1 did oppose Fitzsimmons at the 1971 convention, the number of votes which a local union has at an IBT convention depends on its size, so that Local 1's voting strength was minuscule, unlikely to be remembered or the subject of retaliation. While the 1972 national election was closer in time to Miller's initiation of the merger procedure, there is no indication in this record that the GEB knew of Local 1's opposition to the Nixon administration, which was communicated to Joint Council 53, or that the merger decision was influenced by it.

Insofar as the Hoffa lawsuit is concerned, the lawsuit was filed on March 13, 1974, long after the merger decision of July 1973. Bender himself disclaimed any belief that the merger was ordered because he attended testimonial dinners. Moreover, other Teamster members expressed strong support for Hoffa and attended Hoffa testimo-

nials without any adverse reaction. Indeed, judging from the testimony before us, a number of highly placed IBT officials consider themselves "Hoffa men."

Plaintiffs contend that the failure of Local 1's organizing campaigns and its consequent inability to gain new members was because of lack of IBT support. They invite us to infer that IBT campaign support was withheld because of Local 1's political views and pro-Hoffa stance. While but little organizing campaign support was in fact given by the IBT to Local 1, we credit ACA Director Selly's testimony that the ACA Division directly responsible for Local 1 was in financial difficulty. In any event, we are satisfied, as indicated above, that the paucity of IBT financial support was dictated by considerations of cost and probability of success and policy judgments as to the desired direction of IBT organizing activity. We find that the withholding of additional support was based on an unwillingness to commit resources to campaigns where the prospect of success was dubious, the cost high, and the numbers of workers to be won low, and not because Bender and the members of Local 1 exercised free speech and political rights.[40]

The only direct evidence of wrongful intent offered by plaintiffs was a statement allegedly made to Bender by IBT Vice President Joseph Treretola at a November 1972 meeting in New York, at which Bender was seeking organizing funds. Bender testified that Treretola warned him that Local 1 might lose its charter because of its pro-Hoffa stance. Treretola denied issuing any such warning. ACA Director Selly's version also disputed Bender, for according to Selly, at the ACA Executive Board meeting on November 28, 1972, Bender reported that Joe Treretola had told him that Local 1's charter might be pulled because of its small size and because the IBT felt it would be more effective if merged with a local with greater resources.

---

**40.** We note that two major campaigns—raids on AFL–CIO unions—aborted in March of 1967 and the spring of 1968, substantially predate any of the events cited as alleged bases for the merger decision. We also note Selly's observation that after 7 years of litigation all Bender had won was the *right* to fight a long battle against the insurance companies.

Treretola was the leader of Teamsters Joint Council 10, comprising all 165,000 Teamsters in New York City, Nassau and Suffolk Counties. As such, Treretola recognized the impotence of Local 1 within the IBT. It was Treretola's position (as it was Miller's) that Local 1 was too small to operate in a highly organized area such as Philadelphia. Indeed, when Treretola first looked at the records he was surprised that Local 1 was so small and he thought a merger would be better for the local. Moreover, he was unaware of Local 1's support for Daley. Our perception of these facts and of the personalities and "styles" of Bender and Treretola and their relationship *inter se* leads us to doubt that Treretola would have deigned to confront Bender with such an ultimatum, and we are not persuaded that he did. Even if he did, however, that isolated piece of evidence—a random comment by one IBT official—would not affect our ultimate finding.

■ We find—on the preliminary injunction hearing record—that the decision to merge Local 1 was the product of the IBT's conclusion, consistent with its merger policies discussed above, that Local 1 was too small, financially too weak, and too ineffective to justify its existence as an independent IBT local union. Concomitantly, we find—on the preliminary injunction hearing record—that the merger was not motivated by a desire to chill the speech of Bender or Local 1 because they had opposed President Nixon or support James R. Hoffa.[41] Our repeated disclaimer limiting our finding to the preliminary injunction record should perhaps dictate that we re-form our findings to merely state that we find no probability that the plaintiffs will succeed in establishing an improper motive for merger which after all is the touchstone of their case. We have set forth our find-

ings in such replete detail for the reason that, with the benefit of expedited discovery, the preliminary injunction hearing bore more resemblance to a full scale trial. Needless to say, however, if plaintiffs can adduce other evidence in further (non-duplicative) discovery, a different result might eventuate at final trial.

On a number of occasions throughout the proceedings we expressed our view to counsel for the IBT that the choice of Local 107 as the entity into which to merge Local 1 seemed inappropriate, if not untoward. In a similar vein, we also expressed the view that Bender is an exceptional individual, a great asset to the union movement, and that it would be beneficial if a merger could be effected with a local in which his talents could be used.[42] But those are not justiciable issues, and a local into which Local 1 and Bender would better fit was apparently unavailable.

### H. The Matter of Irreparable Harm

Plaintiffs' presentation on the subject of irreparable harm consisted mainly of evidence about the confusion and uncertainty which would be created *pendente lite* by the failure to maintain Local 1 as an entity or by the transfer to an official of Local 107 of the duties thus far carried out by Bender.

Local 1 has most recently been in collective bargaining negotiations with Inner City Broadcasting Company (radio stations WLIB–AM and WBLS–FM in New York), State Farm Automobile Insurance Company and State Farm Fire and Casualty Company, and radio stations WIP and WMMR in Philadelphia. (The WIP–WMMR collective bargaining contract expired on December 15, 1975.) Local 1 also has pending unfair labor practice charges against Radio Station WLIB before the National Labor

41. Plaintiffs have also suggested that we should infer an improper motive from the insistence of the GEB on merger in spite of the opposition of Locals 1 and 115, and in view of the long period of time it took to effectuate. We draw no such inference. Indeed, the patience of the IBT with the extensive delay in effecting merger contraindicates an improper motive.

42. Selly, on the other hand, was of the view that Local 1 would be better off with Local 107 because of 107's greater size, though he conceded that the members of Local 1 might not be happy there. There are Local 107 members who are not truck drivers.

Relations Board. State Farm, after receiving notice from Local 107, has refused to meet a second time for collective bargaining with Local 1, and has filed a Representation Petition before the National Labor Relations Board in Region 29. Correspondence received from plaintiffs' counsel during the time these findings have been in preparation indicates that this confusion continues without abatement. There is no real doubt that the uncertain status of Local 1 in the Teamsters organization has had and is having serious effects on its ability to maintain or increase its organizational and representational duties within its jurisdiction. Ordinary remedies at law could not repair this harm, assuming plaintiff were entitled to a remedy. However, these proofs somewhat miss the point as an effort to demonstrate entitlement to preliminary injunctive relief. As discussed in Part VI.B.2. *infra,* the relevant question relates not to the undeniable harm that plaintiffs have already suffered, but to the harm that plaintiffs *would* suffer during the period between denial of a preliminary injunction and a later, hypothetical decision to grant them permanent relief. Thus, the appropriate question is, in effect, whether plaintiffs have shown that an immediate but temporary merger with Local 107, *pendente lite,* would cause them irreparable injury.

■ No evidence was adduced, and hence we cannot find, that Local 107 would not negotiate contracts, service the membership, or pursue grievances for former members of Local 1. Nor is there reason to believe that under the existent, unfortunate, unstable circumstances, employers would be likely to resume bargaining with Local 1 under a preliminary injunction, but not agree to bargain with Local 107 on behalf of the same employees if the injunction were preliminarily denied. It is true that we have inferred from the record as a whole that the choice of Local 107 as the unit into which to merge Local 1 was unwise, but under the legal standards govern-

ing judicial intervention in union affairs, discussed above, that conclusion is patently insufficient. On the significant issue of irreparable harm, we are thus faced with a failure of proof.[43]

## VI. Discussion on the Preliminary Injunction Hearing

### A. The Standard for Granting Preliminary Relief

■ In the light of the foregoing findings of fact, we turn to the question whether plaintiffs are entitled to preliminary injunctive relief under any of their causes of action, 42 U.S.C. § 1985, violation of the LMRDA and violation of the IBT-Local contractual relationship. We must consider:

whether the alleged injury is imminent, whether that injury would be irreparable, whether the plaintiff is likely to prevail after trial on the merits, and the effect of granting or denying the preliminary injunction on the public interest.

*Ammond v. McGahn,* 532 F.2d 325, 329 (3d Cir. 1976) (footnotes omitted). Also important are the questions:

Did the movant show that, without [preliminary] relief, it would be irreparably injured? [And also:] Would the grant of a preliminary injunction substantially [harm] other parties interested in the proceedings?

*A. O. Smith Corp. v. F. T. C.,* 530 F.2d 515, 525 (3d Cir. 1976). The appropriate consideration of these multiple factors requires a weighing and balancing process. *Oburn v. Shapp,* 521 F.2d 142, 147 (3d Cir. 1975). For example, a strong likelihood of irreparable harm to the plaintiff, third parties, and the public interest would permit the grant of a preliminary injunction even where there was a bare, rather than a great probability of success on the merits. *Delaware River Port Auth. v. Transamerican Trailer Transport, Inc.,* 501 F.2d 917, 920 (3d Cir. 1974). On the other hand, each element is a necessary prerequisite to some degree. In the

---

**43.** We note too that Local 1 has the option to disaffiliate from the IBT and retain its identity.

Bender testified, however, that he preferred to remain within the IBT and "fight."

complete absence of any one factor, the injunction may not issue. See, e. g., Ammond, supra, 532 F.2d at 329 (where harm not imminent, no need to consider likelihood of success).

### B. Imminent Irreparable Harm; Effect on Third Parties and the Public Interest

1. *Imminence.* The alleged injury in this case is clearly imminent; the merger of Local 1 into Local 107 has been finally ordered, and that order has been reaffirmed by the GEB. The testimony showed that were it not for this lawsuit, the merger would long since have been effectuated. The element of imminence is satisfied. Compare *Ammond, supra.*

2. *Irreparability.* The danger of irreparable injury to the plaintiffs which we must evaluate is that harm which might ensue *during the pendency of the litigation* if we deny a preliminary injunction now but later decide on a fuller record that permanent relief is appropriate. *See* O. Fiss, Injunctions 168 (1972). In other words, if the plaintiffs are forced to endure membership in and representation by Local 107 from now until the final disposition of this case, at which time we, hypothetically, invalidate the merger, will that "harm" be compensable by ordinary legal remedies? The plaintiffs' evidence showed that so long as the unconsummated threat of merger hangs over Local 1, the local can neither serve its membership properly nor organize new workers within its jurisdiction. Employers have refused to bargain, and contracts have run out without renegotiation.[44] This injury is already past and therefore can no longer be prevented by injunction. The relevant questions must look to the future: Can we infer that the membership of Local 1 would be ill-served by Local 107's representation? Will employers, knowing of the resistance of the Local 1 members to

the merger and of its non-final status, *continue* their alleged refusal to bargain?

As to the first question, we have already noted a failure of proof. *See* Part V.H. *supra.* We could only speculate, not infer, that Local 107 would improperly or inadequately represent the interests of those who are now members of Local 1. We have no reason to conclude that Local 1's members or leaders would be ineligible for any rights or privileges as Teamsters, that Local 107 does not negotiate good contracts, that it does not press grievances or that it discriminates against members who are not truck drivers. *Cf. San Filippo v. United Bhd. of Carpenters,* 525 F.2d 508, 512 (2d Cir. 1975). The second question, the possible reaction of employers to a non-final merger following upon denial of a preliminary injunction, is somewhat closer. We think it is reasonable to infer that the kind of qualms apparently already expressed by these employers would not be allayed by so ambiguous an event as denial of a preliminary injunction. Thus, we can infer that if we deny the injunction and the merger ensues employers will continue to refrain from bargaining and there will be irreparable harm. The problem is that if we granted a preliminary injunction, we cannot say employers would be any more willing to bargain with Local 1, until the merger order were either officially withdrawn or permanently enjoined. Only a *final* resolution of this matter will ensure stable and proper representation of Local 1's membership. This factor cuts hardly at all in favor of issuance of the preliminary injunction.

3. *Interests of the Public and Third Parties.* The immediately preceding discussion applies equally well to this factor. The public interest lies in prompt resolution of internal union struggles, which detract from the national labor policy of orderly collective bargaining between employers and the freely chosen representatives of employees. No temporary action taken in

---

44. This refusal to bargain, if such it was, would not necessarily be improper. After a merger, the representative status of the new labor organization is often in doubt. *See, e. g., American Bridge Div., U. S. Steel Corp. v. NLRB,* 457

F.2d 660 (3d Cir. 1972); *Retail Store Employees Union, Local 428 v. NLRB,* 528 F.2d 1225 (9th Cir. 1975); *William B. Tanner Co. v. NLRB,* 517 F.2d 982 (6th Cir. 1975).

this case can serve this policy adequately. The same applies to third parties, especially employers. Their interest in avoiding labor strife by negotiating collective agreements is thwarted so long as the official representative of· these workers remains undetermined. This factor, like that of irreparable harm, does not aid the case for issuance of a preliminary injunction.

### C. Probability of Success on the Merits

The plaintiffs' weak showing on the first four factors means that only an exceptionally strong probability of success on the merits after a final trial could justify preliminary relief. On the evidence received so far, however, the probability of success is not high. Accordingly, we must refuse to issue the injunction.

### 1. Section 1985, and the LMRDA Bill of Rights and Fiduciary Duty Provisions

■ We have held that a merger is not "discipline" *per se* under the LMRDA; hence, the success of plaintiffs' case depends on their ability to prove an invidious motivation. This they failed to do, at least at this preliminary stage. *See* Parts V.F. & G. *supra.* The same applies to their claims under § 501 and under 42 U.S.C. §§ 1985(2) and (3). We therefore must hold there is no ascertainable probability of success on the merits of the Civil Rights or LMRDA claims, and no preliminary injunction can issue on that basis.

### 2. Violation of Contract Under § 301(a) of the LMRA

■ As a federal district court, we have jurisdiction under § 301(a) of the Labor Management Relations Act over "[s]uits for violation of contracts . . . between . . . labor organizations, . . . without regard to the amount in controversy . . .." 29 U.S.C. § 185(a) (1970). The Constitution and By-Laws of the IBT and the Affiliation Agreement between the IBT and the ACA are "contracts" between Local 1 and IBT within the meaning of § 301(a). *Keck v. Employees Ind. Ass'n,* 387 F.Supp. 241, 248–50 (E.D.Pa.1974); *Car-*

*penters Local 853, supra,* 83 LRRM at 2766 n.10; see *Musicians' Protective, etc., Local No. 274 v. American Federation of Musicians,* 329 F.Supp. 1226, 1228 (E.D.Pa.1971). We therefore must determine whether the facts adduced at the preliminary hearing show a breach of either agreement.

■ The relevant provisions of these documents are set out in Parts V.A. & C. above. While the IBT promised in the Affiliation Agreement that Local 1 would "retain [its] present jurisdiction," that promise was not open ended. Moreover, the affiliation agreement made the IBT constitution supreme. Hence, the real question, as plaintiffs have consistently realized in their memoranda, is whether the merger violates Article IX, § 11 of the IBT Constitution, relating to mergers. Plaintiffs have not contended that the merger order violates § 11 on its face in any procedural respect, as indeed they could not, for in plain language that provision vests the entire merger power in the GEB "in its discretion." A referendum of affected members is permitted but not required; even when held, the referendum is "advisory only." There is no independent requirement of law that a referendum, "due process," or a "fair hearing" be afforded prior to a merger of locals, other than that provided in the LMRDA in the case of "discipline." See *Carpenters Local 853, supra,* 83 LRRM at 2766.

■ When Local 1 made application for its IBT Charter, the signatories pledged themselves to be governed by the IBT Constitution, and the Charter contract obligated Local 1 to abide by the IBT Constitution. The acceptance of the Charter subjected Local 1 to the obligation to comply with the GEB's directives, including the merger order. Moreover, the GEB's interpretation of the Constitution cannot be set aside by the courts unless arbitrary and unreasonable. *Musicians etc., Local No. 274, supra,* 329 F.Supp. at 1236.

■ As we have seen, plaintiffs contend that invidious punishment cannot be an "appropriate" reason for merger within the meaning of § 11, and we agree. But our findings of fact show that theory to be thus

far inapposite to this case. On the record before us, there is essentially no probability that plaintiffs will prove an invidious motivation, and thus we find no violation of the IBT Constitution has been proved. Accordingly, no preliminary injunction can issue under our § 301(a) jurisdiction.