853 F.2d 186
 128 L.R.R.M. (BNA) 3153, 114 A.L.R.Fed. 835,
109 Lab.Cas. P 10,640
 Dino LORETANGELI, Frank Forst, Thomas Stiglic, and Local
194, New Jersey Turnpike Employees' Union,
International Federation of Professional
and Technical Engineers,
AFL-CIO, Appellants,
v.
Dominick CRITELLI, Michael T. Waske, Rudolph E. Thomas,
Vincent C. Cacchiotti, Ralph J. McElfresh, Des
Cupid, Gregory Junemann, John H. Dunne,
and Rodney A. Bower.
 No. 87-5886.
 United States Court of Appeals,
Third Circuit.
 Argued June 6, 1988.
Decided Aug. 1, 1988.
 
 David Tykulsker (argued), Ball, Livingston & Tykulsker, Newark, N.J., for appellants.
 David S. Barr, Barbara L. Camens (argued), Barr & Peer, Washington, D.C., James R. Zazzali, Kenneth I. Nowak, Zazzali, Zazzali & Kroll, Newark, N.J., for appellees.
 Before STAPLETON, GREENBERG, and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 ROSENN, Circuit Judge.
 
 
 1
 This appeal arises out of a dispute between the International Federation of Professional and Technical Engineers, AFL-CIO (Federation), and some of its membership over the Federation's disbursement of union funds. The primary question raised is the scope of the "good cause" prerequisite to the institution of federal suits by union members against union officials under the Labor Management Reporting and Disclosure Act (LMRDA or the Act), 29 U.S.C. Sec. 501 (1982).
 
 
 2
 The plaintiff-appellants, members of Local 194, New Jersey Turnpike Employees' Union, and the Local itself, sought to challenge the payment of rebates of per capita dues to two other union locals made by the parent organization, the Federation. The plaintiffs claimed that the defendants, the nine members of the Executive Council of the Federation, had breached their fiduciary duties under the LMRDA, 29 U.S.C. Sec. 501(b), by making the rebates in violation of the Federation's constitution. The district court dismissed the complaint and denied the plaintiffs' motion for a preliminary injunction, holding that the plaintiffs had failed to show "good cause" for their suit because the defendants' actions were authorized under the Federation's reasonable interpretation of its constitution. We reverse the dismissal of the complaint and remand the case for further consideration of the plaintiffs' application for a preliminary injunction.[1]
 
 I.
 
 3
 The Executive Council is specifically "empowered to authorize such expenditures of the funds of the Federation as in its judgment are necessary to carry out and fulfill the purposes and objectives of the Federation."[2] Article X Sec. 1. The Council's apparently broad authority is circumscribed by a general constitutional provision which appears to deny it the power to selectively "grant special financial assistance in the form of rebates, refunds, etc., to any local union." Article XVIII Sec. 2. The proper interpretation of this constitutional provision lies at the heart of the present appeal.
 
 
 4
 It is undisputed that the Federation has maintained a long-standing practice of granting "special financial assistance" to certain local unions for the purpose of meeting union objectives. The plaintiffs contend, however, that this special financial assistance has only recently taken "the form of rebates." It is also undisputed that in 1984 the Federation began rebating 52% of the per capita dues paid by Local 17 and 18.1 or 22% of the per capita dues paid by Local 195.[3] Rebates provided these locals with a substantial benefit. From 1985 through 1986, the Federation rebated over $60,000 to Local 195 and $170,000 to Local 17, for a total exceeding $234,000. The rebates continue to the present day, although at a reduced rate. The locals receiving rebates are the two largest in the Federation and the chief officer of each is a member of the Executive Council.
 
 
 5
 The Executive Council rebated a substantial portion of the per capita dues of the locals despite the Federation's serious financial problems. The Federation had a deficit of $78,000 for fiscal year 1986-1987 and it projected a deficit of $137,000 for fiscal years 1987-1989. The Federation preserved its fiscal integrity only through a drastic economic reorganization, which included the layoff of three of the Federation's eleven staff members. The effect of these terminations is disputed: the plaintiffs contend that the layoffs have crippled the Federation's ability to serve its locals and the defendants claim that there has been no change in effectiveness.
 
 
 6
 The plaintiffs made every effort to halt the rebate payments through internal union mechanisms. Plaintiff Forst presented a resolution to the 1986 convention calling for the gradual termination of all financial assistance programs over a five-year period, but the resolution was defeated.[4] The Executive Council also rejected the plaintiffs' demand that it terminate the rebate payments. After these attempts to use internal union procedures failed, the plaintiffs presented an ex parte application in the United States District Court for the District of New Jersey seeking permission to bring suit under 29 U.S.C. Sec. 501. They asserted that the members of the Council had breached their fiduciary duties by authorizing the unconstitutional rebates.
 
 
 7
 The court found that the plaintiffs had met the good cause prerequisite to suit and permitted the filing of their complaint. The defendants then challenged this ex parte determination, a procedure recognized in Dinko v. Wall, 531 F.2d 68, 73-74 (2d Cir.1976), contending that the plaintiffs had not demonstrated "good cause" because the defendants' actions were authorized under the union's interpretation of the constitution. After briefing, oral argument, and the submission of affidavits, another judge assigned to the action held that the plaintiffs had failed to show good cause. The judge vacated the leave to sue, dismissed the plaintiffs' complaint with prejudice, and denied their motion for a preliminary injunction.
 
 II.
 A. The Good Cause Requirement
 
 8
 In enacting the LMRDA, Congress found that the free flow of commerce depended on adherence by labor organizations and employers "to the highest standards of responsibility and ethical conduct in administering the affairs of their organizations...." 29 U.S.C. Sec. 401(a). Congress noted that its investigations of labor organizations had revealed breaches of these standards, and it therefore further found "that the enactment of this chapter is necessary to eliminate or prevent improper practices on the part of labor organizations ... and their officers and representatives...." 29 U.S.C. Sec. 401(b) and (c).
 
 
 9
 The LMRDA makes union officers fiduciaries who have a duty to expend union funds "solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder...." 29 U.S.C. Sec. 501(a). Members of a labor organization may sue labor officials for violations of their fiduciary duties in federal district court. 29 U.S.C. Sec. 501(b). The Act places certain restrictions on the right to sue, however, one of which is that a union member may not file suit "except upon leave of the court obtained upon verified application and for good cause shown, which application may be made ex parte." Id. (emphasis added).
 
 
 10
 Section 501 thus reflects two different policy concerns. In subdivision (a), Congress intended to protect rank and file union members by imposing a duty on union officials to act as fiduciaries with respect to union funds and property. 29 U.S.C. Sec. 501(a). Yet, concerned with the potential for harassing and vexatious suits brought without merit or good faith against union officials, and also with the specter of unwarranted judicial intrusion into the processes of union democracy, Congress designed section 502(b)'s good cause requirement as a prerequisite to suit. Courts have struggled to give a content to the "good cause" requirement that will effectuate both policies.
 
 
 11
 The district court, relying on a test for "good cause" developed by the Court of Appeals in Dinko v. Wall, 531 F.2d 68 (2d Cir.1976), examined the plaintiffs' probability of success on the merits of their claims and denied leave to file suit. The plaintiffs contend that the district court erred in adopting this analysis.[5] Review of this question of law is plenary. D.P. Enterprises v. Bucks County Community College, 725 F.2d 943, 944 (3d Cir.1984).
 
 
 12
 The Ninth Circuit Court of Appeals undertook the first extensive analysis of the good cause requirement in Horner v. Ferron, 362 F.2d 224, 229 (9th Cir.), cert. denied, 385 U.S. 958, 87 S.Ct. 397, 17 L.Ed.2d 305 (1966). The Horner plaintiffs were union members who sought to bring a section 501 suit against union officers who had established and funded a severance plan for their own benefit without valid authorization. Id. at 228. After reviewing affidavits, memoranda, and oral testimony, the district court denied the plaintiffs' application to bring suit, finding a lack of good cause. Id. at 227. The court of appeals reversed.
 
 
 13
 Initially, the appellate court noted that the existence of "good cause" might be discernible from the allegations of the verified complaint filed ex parte. Id. at 228. If either the court or the defendant requested a hearing, the court could, if it so chose, "look somewhat beyond the complaint in determining whether the plaintiff ha[d] made the 'good cause' showing required...." Id. at 229. The absence of good cause might be demonstrated through undisputed affidavits showing that the plaintiffs had failed to comply with some condition precedent to suit or that the action was barred by the statute of limitations, or by the application of the principles of res judicata or collateral estoppel. Id.
 
 
 14
 The scope of the district court's inquiry was, however, to be limited:
 
 
 15
 [W]e think it inappropriate to consider, at such a hearing, defenses which require the resolution of complex questions of law going to the substance of the case. Defenses of this kind should be appraised only on motion for summary judgment or after a trial. Defenses which necessitate the determination of a genuine issue of material fact, being beyond the scope of summary judgment procedures are a fortiori, beyond the scope of proceeding to determine whether a section 501(b) complaint may be filed.
 
 
 16
 Id. (footnote omitted). The court of appeals held that the plaintiffs' complaint had been dismissed erroneously because the district court had either resolved complex issues of law or determined genuine issues of material fact. Id. at 229-232.
 
 
 17
 This court adopted the Horner court's cogent analysis of the "good cause" requirement, as did many others.[6] The Dinko court, however, reexamined and modified the good cause requirement first described in Horner.
 
 
 18
 In Dinko, the court followed Horner in finding that
 
 
 19
 [t]he factual showing to institute a suit should be no more demanding than that required to defend it against a motion for summary judgment; indeed, it should be somewhat less, since at the earlier stage a plaintiff has not yet had a chance for discovery and a defendant will still have the later protection of a summary judgment motion.
 
 
 20
 531 F.2d at 75. The court went beyond Horner, however, in actually defining "good cause." After considering the policies Congress sought to further in section 501 and examining the section's legislative history, the court concluded that "good cause in section 501(b) is construed to mean that plaintiff must show a reasonable likelihood of success and, with regard to any material facts he alleges, must have a reasonable ground for belief in their existence."[7] Id. Because the district court did not rely on the second prong, only the first portion of the standard is at issue here.
 
 
 21
 Although this court has never before considered Dinko's analysis of "good cause," its formulation has met with acceptance elsewhere, primarily with district courts.[8] In this case, the district court apparently assumed that it had to consider whether the plaintiffs' claims had "a reasonable likelihood of success" at the good cause stage of the proceedings. We disagree. Dinko is an attempt to give the good cause requirement a more precise content, but the standard adopted is not mandated by the statute's language, finds no support in the LMRDA's legislative history, conflicts with the Congressional policy of protecting union members, and permits summary elimination of meritorious as well as vexatious suits.
 
 
 22
 Section 501 requires only that a plaintiff obtain leave of court to file an action "upon verified application and for good cause shown, which application may be made ex parte." 29 U.S.C. Sec. 501(b). "Good cause" is nowhere defined in the statute. Nor does the legislative history supply a definition; as the Dinko court itself noted, the legislative history is "unilluminating." 531 F.2d at 74[9].
 
 
 23
 Turning from the statute's terms and legislative history, we look to Congressional purpose to illuminate the requirement's meaning. See, e.g., 2A Singer, Sutherland Statutory Construction Secs. 45.09, 46.04 (1984 rev.). The "reasonable likelihood of success" standard promulgated in Dinko fails to strike the proper balance between apparently conflicting Congressional purposes.
 
 
 24
 The Dinko court glosses over Congress' expressed intent to protect union members from fiduciary breaches by union officials. Thus, meritorious actions may be eliminated by preliminarily requiring a "reasonable likelihood of success" on the application for leave to file, particularly because discovery is not yet available. See Horner, 362 F.2d at 229 n. 6[10]. The standard, on the other hand, overemphasizes the purpose of guarding against vexatious suits. Dinko's focus on the probability, rather than the possibility, of success is a judicial creation at variance with Congressional intent. The statutory permission for plaintiffs to file an ex parte application for leave to sue, 29 U.S.C. Sec. 501(b), suggests a low level of judicial scrutiny at this point. The language of the statute certainly does not require that the district court then make a searching inquiry into the merits of the suit.[11]
 
 
 25
 Finally, the substantive requirement of the Dinko standard is unsupported by prior case law. The Dinko court derived the "reasonable likelihood of success" portion of its standard from a separate line of section 501 cases concerning attorney representation. Id. at 75. Plaintiffs seeking to prevent a union's retained attorney from representing section 501 defendants were required to make a "reasonable showing" of their likelihood of success, see Holdeman v. Sheldon, 311 F.2d 2, 3 (2d Cir.1962) (per curiam), and Dinko incorporated this standard into the section 501 good cause determination. The plaintiffs' burden in the attorney cases, however, is directly related to the extraordinary relief they seek by injunction. See id. (standard applicable "on motions for injunctions of this sort"). The requirement exceeds whatever may be necessary to weed out vexatious suits. Further, the Dinko court failed to articulate any basis for treating the plaintiffs' application to file a complaint as if it were a motion for an injunction.
 
 
 26
 We therefore hold that the existence of "good cause" may be discernible from the allegations of the verified complaint. If either the court or the defendant requests a hearing, the court may look beyond the complaint to determine whether there is an absence of good cause because of some jurisdictional or fundamental defect, such as a failure to comply with some condition precedent to suit, or a bar imposed by the statute of limitations, the principles of res judicata, or collateral estoppel. The court may not, however, consider at this stage defenses which require the resolution of complex questions of law going to the substance of the case or which necessitate the determination of a genuine issue of material fact. See Horner, 362 F.2d at 228-29; see also Erkins, 663 F.2d at 1053; Sabolsky, 457 F.2d at 1252; Purcell v. Keane, 406 F.2d 1195, 1200 (3d Cir.1969). The district court in this case therefore erred as a matter of law in applying the Dinko test and in vacating the plaintiffs' leave to file their complaint.
 
 B. Interpreting the Union Constitution
 
 27
 The plaintiffs' cause of action faces yet another hurdle. The defendants admit expending union funds on rebates of per capita payments to Locals 17 and 195. They contend, however, that these rebates were constitutionally authorized by Article X and not prohibited by Article XVIII of the Federation's constitution. The parties thus present conflicting interpretations of the Executive Council's constitutional authority. In ruling on the "good cause" issue, the district court examined the merits of this interpretive dispute. It rejected the plaintiffs' complaint because the Federation's construction of the constitution was not "patently unreasonable." See, e.g., Local 334 v. United Ass'n of Journeymen, 669 F.2d 129, 131 (3d Cir.1982) (quoting Stelling v. Inter. Brotherhood of Elec. Workers, 587 F.2d 1379, 1388 (9th Cir.1978), cert. denied, 442 U.S. 944, 99 S.Ct. 2890, 61 L.Ed.2d 315 (1979)). Under the Horner approach reaffirmed here, the district court erred in considering the union's interpretation of its constitution at the good cause stage of the proceedings.
 
 
 28
 The plaintiffs submitted a verified complaint that quoted the article of the union constitution that had allegedly been violated. The provision at issue appeared to explicitly prohibit the grant of rebates. The plaintiffs thus established good cause for leave to sue in the ex parte proceeding. Compare Sabey v. Steelworkers Local 12230 of United Steelworkers of America, 113 L.R.R.M. (BNA) 3603 (W.D.N.Y.1982) (no good cause where plaintiffs unable to show source of fiduciary duty in constitution).
 
 
 29
 The defendants exercised their right to challenge the ex parte determination. Under Horner, the district court could have considered defendants' claims that the plaintiffs had failed to meet the procedural prerequisites for suit or that their cause of action was barred by the statute of limitations or the operation of res judicata or collateral estoppel. 362 F.2d at 229. Here, however, the defendants asserted factual and legal arguments going to the merits of the dispute. They proffered an alternative interpretation of the Federation constitution under which their actions would have been authorized and argued that this interpretation must be granted deference. This approach created a question of fact regarding the interpretation of the constitution's provision, making dismissal at the good cause stage inappropriate. In addition, the defendants' invocation of the deference principle raised a complex question of law going to the merits of the dispute.
 
 
 30
 In Sabolsky, 457 F.2d at 1249, this court reviewed a district court's dismissal of a complaint charging union officials with the breach of fiduciary duties under section 501. The defendants argued that the district court was bound to defer to the union's interpretation of its constitution. We rejected the dismissal of the complaint based on this argument, holding that in the absence of any criteria in the record by which a union interpretation can be measured, the principle of judicial deference "cannot be used to give carte blanche to union activity which is alleged to constitute a violation of the broad fiduciary duties of union officials under the LMRDA." 457 F.2d at 1252. Here too, the record remains incomplete. The precise nature of the Federation's interpretation of Article XVIII is in question. The plaintiffs argue, for example, that financial assistance in the form of rebates is a recent phenomenon and that there is no long-standing binding union interpretation of the treatment of rebates under Article XVIII. Questions of fact thus remain.
 
 
 31
 We therefore hold that the serious interpretive dispute at issue in this case cannot be resolved at the good cause stage of the proceedings because it poses a complex question of law going to the substance of the case whose resolution also necessitates the determination of a genuine issue of material fact. Horner, 362 F.2d at 229. The plaintiffs' complaint must therefore be reinstated.
 
 III.
 
 32
 Plaintiffs also appeal the district court's denial of a preliminary injunction prohibiting any further rebate payments. The district court's determination will be reversed only if the court abused its discretion, committed an obvious error in applying the law, or made a serious mistake in considering the proof. A.O. Smith Corp. v. FTC, 530 F.2d 515, 525 (3d Cir.1976). On appeal the scope of review is limited:
 
 
 33
 [T]he appellate court asks: (a) did the movant make a strong showing that it is likely to prevail on the merits? (b) did the movant show that, without such relief, it would be irreparably injured? (c) would the grant or denial of a preliminary injunction substantially have harmed other parties interested in, or affected by, the proceedings? (d) where lies the public interest?
 
 
 34
 Klitzman, Klitzman and Gallagher v. Krut, 744 F.2d 955, 958-59 (3d Cir.1984). Our discussion will focus on the district court's analysis of the likelihood of the plaintiffs' success on the merits.
 
 A. Likelihood of Success on the Merits
 Under Article XVIII:
 
 35
 The President and the Executive Council are denied any and all authority to grant special financial assistance in the form of rebates, refunds, etc., to any local union which special concession is not at the same time uniformly accorded all of the other local unions.
 
 
 36
 The plaintiffs contend that this provision unambiguously bars the Executive Council's non-uniform grant of special financial assistance in the form of rebates.[12] The defendants argue that this reading of the provision is unworkable. Noting that the provision includes a list of prohibited financial arrangements followed by an "etc.," they assert that Article XVIII refers to special financial assistance given in any form. Inasmuch as the purposes of the Federation require that the Executive Council be given the power to offer localized assistance,[13] the Federation argues that Article XVIII requires only that the Executive Council offer special financial assistance on a non-discriminatory basis.
 
 
 37
 The district court found that the plaintiffs were unlikely to succeed on the merits of their section 501 claim. The court arrived at this conclusion by following an oft-cited principle of judicial deference:
 
 
 38
 "[C]ourts are reluctant to substitute their judgment for that of union officials in the interpretation of the union's constitution, and will interfere only where the official's interpretation is not fair or reasonable."
 
 
 39
 Local 334, 669 F.2d at 131 (quoting Stelling, 587 F.2d at 1388). The district court found that the Federation's interpretation was not "patently unreasonable" and therefore concluded that the plaintiffs' action had no reasonable possibility of success. In so holding, the district court misconstrued the proof presented and erred as a matter of law.
 
 
 40
 First, the district court's analysis reveals "a serious error in considering the proof." A.O. Smith, 530 F.2d at 525. The analysis was flawed because it misstated or misunderstood plaintiffs' position. The inaccuracy can be found in the portion of the analysis devoted to determining the force of the plaintiffs' constitutional interpretation:
 
 
 41
 The Executive Council is given broad authority to expend the funds of the Federation for legitimate union purposes. It would, on the other hand, be unreasonable to prohibit the Federation's governing bodies from basing grants of financial assistance on variable but rational factors. It would be unreasonable to require that the Federation match all grants given to certain locals with equal sums for other locals without considering the particular circumstances of each one. This would hamper rather than further the effective functioning of the Federation.
 
 
 42
 The plaintiffs do not challenge the grant of special local assistance based upon variable local factors. They make no suggestion that the Federation match grants given to certain locals with equal sums given to other locals. They seek only the termination of special local assistance granted in the form of rebates, a form of payment that they contend patently violates Article XVIII of the Federation constitution. The district court therefore misconstrued the plaintiffs' proffered interpretation.
 
 
 43
 Second, we believe that it was an error of law to defer to the Federation's interpretation of its constitution. Such deference was inappropriate here, where the Federation's interpretation conflicted with the stark and unambiguous language of the constitution.
 
 
 44
 The plaintiffs correctly note that Article XVIII plainly limits the Executive Council's power to expend union funds "in the form of rebates, refunds, etc." This constitutional provision thus protects union funds by promoting careful budgeting and financial oversight. Under a rebate system, the Federation's expenditure of funds is not directly related to the amounts actually required by locals to perform specified services. By rebating, the Federation relinquishes the power to carefully control the locals' use of Federation funds. The plaintiffs' interpretation thus follows the constitution's clear language and furthers the high standards of responsibility and ethical conduct required by Congress of labor organizations in the administration of their affairs. See 29 U.S.C. Sec. 401.
 
 
 45
 In contrast, the Federation's interpretation of the constitutional provision violates its terms. The linchpin of the defendants' argument is that the constitutional provision applies to special financial assistance in any form. They thus essentially contend that the "etc." in the provision nullifies the immediately preceding words "in the form of rebates, refunds." This specious argument wholly ignores the laudable objectives served by prohibiting expenditures in the form of rebates. The defendants also adopt a contorted reading of the last clause of the provision, suggesting that "which special concession is not at the same time uniformly accorded all of the other local unions" means nothing more than an equal opportunity for all locals to apply for rebates. Finally, the defendants attach undue significance to the placement of Article XVIII in the constitution's "General Provisions" rather than in the sections concerning power over expenditures.
 
 
 46
 None of the cases relied upon by the defendants requires us to ignore the plain terms of the Federation's constitution and to defer to the strained reading they advocate. The mixture of cases cited by defendants consists of those in which plaintiffs' section 501 claims were dismissed either because (1) they failed to allege violations of a specific constitutional provision or (2) they relied upon a constitutional provision that obviously did not apply.[14] Here, however, it is likely that the Federation's interpretation will be found "patently unreasonable" because it reads out of the constitution an important protective provision.
 
 
 47
 The plaintiffs point to a specific constitutional provision which, by its terms, prohibits the defendants' actions. Compare Gabauer v. Woodcock, 594 F.2d at 668-670 (court rejects plaintiff's challenge to the union's expenditure of funds where no constitutional provision specifically prohibits the expenditures),[15] with Kerr v. Shanks, 466 F.2d 1271 (9th Cir.1972) (defendants violate section 501 by failing to hold referendum as explicitly required by constitution), cert. denied sub nom. Screen Extras Guild v. Kerr, 412 U.S. 918 (1973). Further, although the defendants strenuously argue that their actions were authorized under a long-standing Federation interpretation, the record suggests that the Federation only recently began the practice of rebates.[16]
 
 
 48
 We therefore conclude that the district court erred in assessing the likelihood of the plaintiffs' success on the merits. It failed to comprehend the thrust of the plaintiffs' constitutional interpretation. Further, it erred as a matter of law in deferring to a proffered union interpretation that violated the unambiguous terms of the Federation constitution.
 
 
 49
 B. Irreparable Harm to the Plaintiffs, the Balancing of
 
 Equities, and the Public Interest
 
 50
 The district court also found that the plaintiffs had failed to show irreparable harm and concluded that the balancing of the equities and the public interest favored denial of the preliminary injunction. The district court's assessment of these factors may have been affected by its misunderstanding of the plaintiffs' position and its inappropriate deference to the Federation's interpretation.
 
 
 51
 The district court found that the plaintiffs had failed to meet their burden of showing irreparable harm. On remand, the plaintiffs may be able to show non-speculative irreparable harm through the continued rebates to the locals without appropriate financial oversight in a time of drastic financial constraints for the Federation.[17] See A.L.K. Corporation v. Columbia Pictures Industries, Inc., 440 F.2d 761, 764 (3d Cir.1971).
 
 
 52
 The district court found that there was "a real possibility of harm to the Federation if an injunction is issued abruptly halting the assistance locals 17 and 195 have received for years." The court concluded that this possibility outweighed any harm to the plaintiffs, particularly since it was unlikely that the plaintiffs would be able to prove that the rebate payments were unconstitutional. Id. The court's weighing of the equities may be altered by its reconsideration of the objectives of the LMRDA and by our conclusion that the plaintiffs' claim has a strong likelihood of success. In addition, we note that the district court's misunderstanding of the plaintiffs' position may have led it to overestimate the degree of potential harm to the Federation. The plaintiffs do not seek to terminate special financial assistance given to locals through proper budgetary and constitutional procedures, only the assertedly unconstitutional rebate payments. An injunction barring rebate payments would not prevent the Federation from making other forms of special assistance payments through constitutional means.
 
 
 53
 Finally, the district court noted the public's interest in furthering the independent operation of union democracies without judicial interference. The dangers of judicial intervention can be over-emphasized. Cf. Sabolsky, 457 F.2d at 1251. It may be, as the plaintiffs claim, that the true public interest lies in vindicating principles of union democracy by requiring the defendants to obey their own constitution. Section 501 embodies this public interest by imposing fiduciary responsibilities on union officials.
 
 
 54
 Our disposition of the good cause and judicial deference issues may thus alter the district court's analysis of the plaintiffs' motion for a preliminary injunction. We will therefore vacate the district court's denial of the motion and remand the application for preliminary injunction for reconsideration in the light of this opinion.
 
 IV.
 
 55
 In summary, the plaintiffs have shown good cause to sue under 29 U.S.C. Sec. 501(b). The district court order vacating the plaintiffs' leave to sue and dismissing their complaint will be reversed with directions to reinstate the complaint. In addition, the order denying the plaintiffs' motion for a preliminary injunction will be vacated and the case remanded for further proceedings consistent with this opinion. Costs taxed against appellees.
 
 
 
 [1]
 The district court had subject matter jurisdiction over the plaintiffs' attempt to file their complaint under 29 U.S.C. Sec. 501(b), 28 U.S.C. Secs. 1331, 1337(a). This court has jurisdiction over the dismissal of the complaint and the denial of the preliminary injunction under 28 U.S.C. Secs. 1291, 1292(a)(1)
 
 
 [2]
 The Executive Council controls the general operations of the union on an ongoing basis. A biannual convention of delegates elected by the union's members actually holds supreme legislative, judicial, and reviewing power, subject to the provisions of the Federation's constitution. But, between conventions, policies and practices are determined by the Executive Council
 Power over financial expenditures is also vested in the Secretary-Treasurer, who is separately "authorized to establish cooperative organizing activities with the local unions and to assume the payment of a reasonable portion of expenses which may arise in connection therewith." Article IX. "[H]owever, such payments shall be made only on the condition that a complete and accurate report of those activities involved are made available to the Federation." Id.
 
 
 [3]
 The facts concerning the rebates are still being unravelled. The plaintiffs withdrew their challenge to the assistance granted to Locals 21, 66, and 121 after discovering that it was not given in rebate form. The parties still disagree about when the rebate payments started, and, at this stage of the proceedings, there is no definitive proof
 
 
 [4]
 Forst contended before the 1986 convention that the rebates were unconstitutional, but his resolution, which required the gradual termination of all financial assistance payments, was defeated. In addition, the convention adopted a resolution directing that the Executive Council "provide guidelines so that federation assistance and servicing can be provided to local unions in an even-handed and equitable manner." The defendants claim that the defeat of Forst's resolution and the adoption of the guidelines resolution constituted a rejection of the plaintiffs' constitutional interpretation. Neither of the convention actions amended the Federation constitutional provision relied upon by the plaintiffs. Article XX; see also Morrissey v. Curran, 423 F.2d 393 (2d Cir.) (constitutional amendment cannot retroactively legitimize breaches of fiduciary duty), cert. denied, 399 U.S. 928, 90 S.Ct. 2245, 26 L.Ed.2d 796 (1970)
 
 
 [5]
 The parties failed to carefully brief the district court on this issue. This court may consider a pure question of law even if not raised below where refusal to reach the issue would result in a miscarriage of justice or where the issue's resolution is of public importance. Dean Witter Reynolds, Inc. v. Fernandez, 741 F.2d 355, 360-61 (11th Cir.1984)
 
 
 [6]
 See, e.g., Sabolsky v. Budzanoski, 457 F.2d 1245, 1252 (3d Cir.), cert. denied, 409 U.S. 853, 93 S.Ct. 65, 34 L.Ed.2d 96 (1972); Erkins v. Bryan, 663 F.2d 1048, 1053 (11th Cir.), cert. denied, 459 U.S. 989, 103 S.Ct. 343, 74 L.Ed.2d 384 (1982); Woods v. Local # 12 Sheet Metal Workers Intern. Assn., 438 F.Supp. 578, 580 (W.D.Pa.1977); O'Connor v. Freyman, 121 L.R.R.M. (BNA) 2387, 2391 (D.D.C.1985); Frantz v. Sheet Metal Workers Union Local No. 73, 470 F.Supp. 223, 228 (N.D.Ill.1979)
 
 
 [7]
 Contrary to the defendants' assertion, Dinko thus represents a modification of Horner. Accord Erkins, 663 F.2d at 1053; Carroll v. Board of Trustees Ohio Highway Drivers Welfare Trust, 573 F.Supp. 935, 937-38 (S.D.Ohio 1983); but see Campton v. Johnson, 95 L.R.R.M. (BNA) 2788 (N.D.Cal.1977) (district court governed by Horner uses Dinko standard)
 
 
 [8]
 See O'Connor, 121 L.R.R.M. (BNA) 2387 (D.D.C.1985); Local 314 v. National Post Office Mail Handlers, 572 F.Supp. 133, 139 (E.D.Mo.1983); Frantz, 470 F.Supp. 223 (N.D.Ill.1979); Brink v. DaLesio, 453 F.Supp. 272 (D.Md.1978), aff'd in part, rev'd on other grounds, 667 F.2d 420 (4th Cir.1982); Campton, 95 L.R.R.M. (BNA) 2788 (N.D.Cal.1977); see also Clark, The Fiduciary Duties of Union Officials Under Section 501 of the LMRDA, 52 Minn.L.Rev. 437, 465-66 (1967) (Fiduciary Duties ); but see Erkins, 663 F.2d at 1053 (rejecting Dinko and adopting Horner )
 
 
 [9]
 The Dinko court nonetheless relied upon the isolated reference to "probable cause " to sue made by Senator Javits, a sponsor of a bill from which section 501 was taken. Id. at 75 n. 12 (quoting 105 Cong.Rec. 6529 (1959) (remarks of Senator Javits)). This remark does not support the imposition of the "reasonable likelihood of success" requirement. "Probable cause" is defined as " 'reasonable ground for belief in the existence of facts warranting the proceedings complained of.' " Clark, Fiduciary Duties, 52 Minn.L.Rev. at 466 (quoting H. Black, Law Dictionary 1365 (4th ed. 1951)). Senator Javits' reference to "probable cause" is thus the fundament of the second prong of the Dinko standard, which is not at issue here. See 531 F.2d at 75
 
 
 [10]
 The defendants argue that section 501 may not properly be used as a vehicle to obtain discovery from the union. See Gabauer v. Woodcock, 594 F.2d 662, 668 (8th Cir.) (plaintiffs may not invoke section as discovery tool to investigate official uses of funds), cert. denied, 444 U.S. 841, 100 S.Ct. 80, 62 L.Ed.2d 52 (1979). This position is inapplicable here, whatever its merits. We are not concerned with whether the plaintiffs may bring suit under section 501 for the sole purpose of securing the release of union financial documents. We merely recognize that meritorious suits may be eliminated by Dinko's requirement that they have a "reasonable probability of success" even before the availability of discovery
 
 
 [11]
 On the other hand, Congress clearly intended that the plaintiff make some showing of the validity of the complaint that exceeded the filing requirements of the Federal Rules of Civil Procedure. Cf. Fed.R.Civ.P. 11, 12(b). Horner recognizes that the defendant should be permitted to show that a complaint, valid on its face, has some jurisdictional or other fundamental defect such as the lack of union membership by the plaintiffs or the presence of res judicata. 362 F.2d at 229. At this level of review, however, consideration of the merits of the defendant's substantive defenses is inappropriate. See id
 
 
 [12]
 The plaintiffs concede that the Federation may continue to offer special assistance to union locals in forms other than rebates or refunds
 
 
 [13]
 The defendants rely on the constitution's broad grants of power to the Executive Committee and to the Secretary-Treasurer to authorize expenditures to carry out the union's purposes. Articles IX and X. Article IX is inapplicable because, by its terms, it concerns the establishment of cooperative organizing activities and requires payment of a "reasonable portion of expenses." There is no proof on this record that the rebates were intended for or used to carry on cooperative organizing activities
 
 
 [14]
 The defendants also refer to a seminal case concerning judicial deference to union interpretations at the summary judgment stage. In Local 334, 669 F.2d 129 (3d Cir.1982), we affirmed the entry of summary judgment against plaintiffs contending that a parent union had violated its constitution in consolidating certain local unions. We noted that the parent union's interpretation of its constitutional power was to be upheld unless it was patently unreasonable, and we concluded that summary judgment was appropriate because there were no disputed material facts relevant to this narrow issue. Id. at 131-32. Local 334 is distinguishable, however, because there the constitution's terms did not specifically support the plaintiffs' position, and, in fact, explicitly mentioned the type of consolidation the plaintiffs claimed was unconstitutional. Id. at 132
 
 
 [15]
 See also Kleppick v. Pennsylvania Tel. Guild, 631 F.Supp. 1073, 1080-81 (W.D.Pa.1986) (plaintiffs failed to meet constitutional prerequisites for referendum); Dinko v. Wall, 421 F.Supp. 207 (S.D.N.Y.1976), aff'd 559 F.2d 1202 (2d Cir.1977) (constitutional provision requiring publication "in full" of "decision" of National did not actually require more than publication of summary of pension plan). Campton v. Johnson is distinguishable on its facts. 95 L.R.R.M. (BNA) at 2790
 The defendants also partially rely on cases which concern challenges to a union's allegedly arbitrary and capricious exercise of its constitutional authority, a matter not at issue here. See, e.g., Local No. 1 (ACA), Broadcast Employees of the Int'l Bhd. of Teamsters, etc. v. International Bhd. of Teamsters, Chauffeurs, Warehousemen, & Helpers of America, et al., 419 F.Supp. 263, 274, 280 (E.D.Pa.1976) (union has constitutional authority to order mergers of locals, plaintiffs suggest power improperly exercised); Lewis v. American Federation of State, County and Municipal Employees, AFL-CIO, 407 F.2d 1185 (3d Cir.) (plaintiff requests judicial review of internal union disciplinary proceeding authorized under constitution), cert. denied, 396 U.S. 866, 90 S.Ct. 145, 24 L.Ed.2d 256 (1969).
 
 
 [16]
 The defendants argue that their interpretation is long-standing, but it is not clear that the Federation ever authorized rebates to union locals before 1984. Compare Davey v. Fitzsimmons, 413 F.Supp. 670, 673-77 (D.D.C.1976) (long-standing union history of national negotiation considered in interpreting terms of a constitutional provision); Lucas v. Bechtel Corp., 800 F.2d 839, 850-51 (9th Cir.1986) (long-standing union interpretation controlling unless repeatedly questioned)
 
 
 [17]
 Traditionally, irreparable injury is suffered where monetary damages are difficult to ascertain or are inadequate. A.O. Smith, 530 F.2d at 525. The plaintiffs contend that they met their burden of proof because they alleged that "the individual defendants will not, jointly and severally, have sufficient financial resources to make good on any damages that have been sustained." This argument is meritless. Highway Truck Drivers and Helpers Local 107 v. Cohen, 334 F.2d 378, 381 (3d Cir.), cert. denied, 379 U.S. 921, 85 S.Ct. 277, 13 L.Ed.2d 335 (1964), the sole authority relied upon by the plaintiffs, concerned a post-judgment injunction and simply does not support the conclusion that money damages may constitute irreparable harm in this case