The **PHILADELPHIA MUSICAL SOCIETY, LOCAL 77**

v.

**AMERICAN FEDERATION OF MUSICIANS OF the UNITED STATES AND CANADA.**

**Civ. A. No. 92–3386.**

United States District Court, E.D. Pennsylvania.

Dec. 2, 1992.

See also 798 F.Supp. 247.

**510**

Lynne P. Fox, Bernard N. Katz, John P. Winicov, Meranze & Katz, Philadelphia, PA, for plaintiffs.

William T. Josem, Cleary & Josem, Philadelphia, PA, John M. West, Bredhoff & Kaiser, Washington, DC, for defendant.

## MEMORANDUM

KATZ, District Judge.

Both sides have requested this court decide this action on the basis of their cross-motions for summary judgment and a hearing. This action arose over a dispute between an international union of musicians and one of its locals over the right to designate the number of local musicians to play on theatrical tours.

The following are uncontested:

1. The court has jurisdiction over plaintiff's claim for breach of the Federation's Bylaws under section 301(a) of the Labor-Management Relations Act, 29 U.S.C. § 185(a).

2. Plaintiff ("Local 77") is a local union chartered by defendant American Federation of Musicians, and is a labor organization pursuant to section 2(5) of the National Labor Relations Act, 29 U.S.C. § 152(5).

3. Plaintiff is a local union comprised of individual Union members who engage in the performance of musical services.

4. Defendant American Federation of Musicians of the United States and Canada (the "Federation") is an international labor organization representing professional musicians engaged in the performance of musical services. The Federation is a "labor organization" within the meaning of Section 2(5) of the National Labor Relations Act, 29 U.S.C. § 152(5). The Federation's headquarters is located in New York City, New York, and the Federation regularly conducts business within the jurisdiction of this court.

5. Pursuant to the Federation Bylaws, the Federation negotiates collective bargaining agreements with various employers on behalf of the musicians they employ in various industries. The Federation conducts its collective bargaining program in two ways: first, the Federation itself conducts certain major collective bargaining negotiations, primarily where the affected musicians consist of members of more than one local union and, second, in other instances the Federation's local unions conduct negotiations on their own behalf.

6. The Federation is recognized as the exclusive representative of musicians employed by employers in numerous industries and, in those instances, the Federation conducts collective bargaining negotiations on behalf of those musicians, including, for example, musicians employed by the phonograph record manufacturers, the theatrical motion picture and TV film producers, the TV networks, and the producers of radio and TV commercial announcements. The Bylaws authorize the Federation to conduct those collective bargaining negotiations and provide that the agreements reached in those negotiations shall be binding on all affected members. Article 13, Sec. 23(a), states:

> All members of the Federation, by virtue of their membership, authorize the Federation and its Locals to act as their exclusive bargaining representative with

full and exclusive power to execute agreements with employers governing terms and conditions of employment. The Federation, by entering into collective bargaining agreements, does so for the benefit of all members of the Federation and each member is bound by the terms of such collective bargaining agreements. A Local of the Federation enters into collective bargaining agreements for its members and for Federation members who perform within the jurisdiction of the Local. Each member of such Local and each Federation member who performs within its jurisdiction is bound by the terms of the collective bargaining agreements executed by such Local. Similarly, the Federation licenses and enters into agreements with booking agents for the benefit of all members of the Federation each member is bound by the terms of such agreements.

7. In conducting Federation negotiations, the Federation's longstanding practice is for the President to appoint a Federation Negotiating Committee consisting of officers (elected members of the International Executive Board), Federation counsel, and staff personnel. The officers of the major local unions whose members are covered by the terms and conditions of employment established by the Federation agreements are customarily appointed to an Advisory Committee that provides input and advice to the Negotiating Committee. Under the Federation Bylaws, all Federation negotiated agreements are subject to a contract ratification procedure in which eligible musicians—based upon prior employment under the agreement being ratified— are eligible to vote (Article 13, Section 23(b)).

8. There are also circumstances in which collective bargaining negotiations are conducted by local unions. Constituent locals conduct such negotiations with various employers within their respective jurisdictional boundaries established when the local is granted a charter. Those jurisdictional boundaries are subject to being changed by the International Executive Board pursuant to the provisions of the Bylaws (Article 4, Sec. 1 and Sec. 11).

9. Plaintiff functions in certain circumstances as a collective bargaining representative for its members.

10. In those instances where a local, like the plaintiff, negotiates a collective bargaining agreement with a particular employer, that agreement establishes the terms and conditions of employment for the musicians covered by that agreement.

11. In those instances were a local, like the plaintiff, negotiates a collective bargaining agreement, it has been designated by its members as the representative of their own choosing to conduct those negotiations.

12. Collective bargaining agreements negotiated by local unions sometimes contain, among other things, a clause specifying the minimum number of local union musicians who shall be allowed to play for an engagement of any kind that takes place in an establishment (venue) covered by that agreement within the jurisdiction of that local. Those clauses are commonly referred to as "local union minimums." Such local union minimums apply, by their terms, to all performances that take place in an establishment covered by the agreement within the local's jurisdiction—including performances under the Federation's Pamphlet B theatrical touring musical agreement.

13. Because local minimums apply to all musical performances, when a Pamphlet B production takes place in a venue covered by the minimum, the producer is required to employ the regular complement of Pamphlet B musicians plus the total number of local musicians provided for in the local's minimum.

14. The Federation has for many years engaged in collective bargaining with the League of American Theaters and Producers (the "League"), a multi-employer organization acting on behalf of each of its members who is engaged as a principal in producing a legitimate first-class commercial theatrical production, including bus and truck, in an out-of-town theater. These Pamphlet B negotiations establish the terms and conditions of employment for all

theatrical touring musicians, who typically are employed for a period of time ranging from several to many months, during which time the show tours from city to city as scheduled by the producer. The producers of theatrical touring musicals usually hire a core number of musicians who rehearse before the show goes on tour and thereafter travel with the production, providing musical services throughout the tour. The number of musicians hired varies from production to production, normally ranging from as few as four musicians to in excess of 20 musicians, depending upon the original musical score, the nature of the production, the complexity of the music and such other factors as the producer may choose to take into account.

15. The touring musicians covered by Pamphlet B are but one type of "traveling" musician subject to the Federation's jurisdiction. More common are the traveling musicians who reside in the jurisdiction of one local (the "home" local), who are employed for a short term engagement in another jurisdiction and then return to their home local upon completion of that engagement. This type of traveling musician is not covered by collective bargaining agreements. Their terms of employment are unilaterally established by the locals in whose jurisdictions they perform, pursuant to the authority conferred on them by the Federal Bylaws (Article 5, sections 11–13).

16. The last Pamphlet B agreement, effective April 1, 1988 through March 31, 1991, contained a Rule 61 which provided as follows:

> The Employer agrees to adhere to the minimum number-of-musician requirements in those theaters where there is an existing contract between a Local Union and the theater where the performances are to take place. The Employer also agrees, prior to any tour, to notify the President's Office of the Federation of the minimum number of Local musicians that will be employed throughout the tour in those theaters where there is no contract between the Local Union and the theater, providing for a minimum number of musicians.

17. That Pamphlet B agreement was extended by mutual agreement, and negotiations for a successor agreement began in July 1991. The negotiations consumed approximately ten (10) days of full-scale bargaining until an agreement was reached six months later—on or about January 29, 1992.

18. The Federation Negotiating Committee convened a meeting of all affected local unions at Federation headquarters in New York City commencing on September 26, 1991. Even in advance of the meeting, some of those locals had voiced their concerns about the Federation's evincing any flexibility at the bargaining table with respect to local minimums. At that meeting, Federation President Mark Tully Massagli and Secretary–Treasurer Stephen R. Sprague reviewed with the officers of each of the locals in attendance the facts concerning the touring theatrical productions that had taken place in their jurisdictions over the last several years—including the minimum provisions of their contracts, the number of venues covered by those contracts, and the manner in which those minimums were applied to each Pamphlet B musical production that had been performed during the time frame. At the end of the meeting, the representatives of each of the plaintiff locals stated their continuing opposition to the Federation agreeing to any revisions of Rule 61.

19. In the agreement ultimately reached by the parties, subject to ratification by the members who work under that agreement, Rule 61 was revised as follows:

> The Employer agrees to adhere to the minimum number of musician requirements in those theaters where there is an existing contract between a Local Union and the theater where the performances are to take place.
>
> Upon expiration of those contracts where there are existing minimums, the Local Union may continue to set minimums in collective bargaining, which shall not exceed sixteen (16) local musicians for Pamphlet B touring theatrical musicals only. On engagements which do not exceed four (4) weeks, up to four (4) musicians

traveling under this agreement may be counted against the local minimums. On those engagements which shall exceed four (4) weeks, the full complement of collectively bargained Local minimums shall continue to apply from the first performance.

On engagements of one (1) week or less only, local minimums shall nor apply to shows that are traveling under Pamphlet B with an orchestra of not less than twelve (12) musicians when local augmentation is not required by the producer.

20. The Federation's Pamphlet B ratification procedure, like the ratification of all other Federation collective bargaining agreements, was administered by the American Arbitration Association (AAA) in New York City. The AAA mails ballots to the residences of all eligible voters (along with a summary of the agreement reached), establishes a cutoff date for the receipt of those ballots at the AAA's New York City office, and on a specified date conducts the opening and counting of ballots and certifies the tally of ballots. Eligible voters under these circumstances were all musicians who had worked under the preceding Pamphlet B agreement, but not local, nontouring musicians. With respect to the Pamphlet B ratification procedure, the ballots were mailed on May 4, 1992, and were scheduled to be opened and counted on June 18, 1992. However, in light of the fact that plaintiffs' counsel advised the Federation that he intended to file the instant lawsuit seeking to set aside the negotiated agreement and to request an order enjoining the counting of the ballots, the Federation, through counsel, agreed to instruct the AAA not to open the envelopes and/or count the ballots until the preliminary injunction hearing concluded. The Federation has issued that instruction to the AAA.

21. The relationship between the Federation, its constituent locals and the members of the Federation and its locals is governed by the Federation Bylaws. Article 4, section 4, of the Bylaws provides:

The acceptance of a charter for a Local of the Federation shall imply upon the part of said Local its agreement to comply with, observe and conform to all the provisions of the Bylaws of the Federation, Standing Orders, Standing or Special Resolutions and directions of any Convention or any order or direction of the Executive Board or a sub-committee thereof or any duly authorized officer of the Federation, then in force or thereafter made or enacted. A violation of any such provisions of the Bylaws, Standing Orders, Standing or Special Resolutions or directions shall subject such Local to expulsion at the discretion of the Executive Board or a sub-committee thereof. The Executive Board may also, on granting such charter, impose such additional conditions and require such additional agreements on the part of such Local as the Executive Board may deem necessary or desirable.

Article 5, section 1, provides as follows:

Locals are required to adopt as part of their Local Constitution and Bylaws a provision to the effect that the Constitution and Bylaws of said Local is subject and subordinate to the Bylaws and amendments thereto of the Federation, and providing further that wherever conflict or discrepancy appears between the Constitution and Bylaws of the Local and the Bylaws and amendments thereto of the Federation, the latter shall prevail. The Bylaws of each Local must contain provisions permitting amendments to said Local's Constitution and/or Bylaws to be made at least annually in accordance with guidelines as promulgated by the International Executive Board.

22. Article 3, section 7, of the Federation Bylaws deals with the authority of the Federation's International Executive Board. In particular, Article 3, section 7(b) provides:

Matters not covered by the Bylaws shall be in the discretion of the Board, which shall have power to adopt such rules, supplementing said Bylaws or covering any matter not contained therein, as it may deem proper, in addition to determining and announcing the policies

of the Federation, all of which rules, matters and policies shall have equal force and effect with the Bylaws.

Article 3, section 7(c) provides:

The Board may, from time to time, repeal, change or amend any such rules, policies or directions, with respect to any such matters.

Article 3, section 7(d) provides:

The Board shall have general supervision of all matters pertaining to the Federation and shall have complete jurisdiction and power of disposition of all matters and questions referring or relating to the Federation or any of its members or any Local thereof, as well as of all matters and questions in which the said Federation or any of its Locals or members may be interested, or by which any of them may be in anywise affected.

Article 3, section 7(e) provides, in relevant part:

The Board shall negotiate all traveling and national scales subject to the jurisdiction of the Federation.

Article 3, section 7(f) provides:

The International Executive Board is given full power and authority to promulgate, adopt, revise, change and/or adjust all prices for traveling musicians and to promulgate, adopt, revise, change, suspend and/or repeal any rules, laws and/or Bylaws pertaining to traveling musicians, including those relating to the filing of contracts or written statements for traveling engagements and/or the procedure for collections of dues based on earnings (work dues) from any traveling member for performing services within the jurisdiction of a Local of which he/she is not a member. The Board may exercise its powers and authorities under this Section in such manner and to such extent as in the sole judgment of the Board maybe in the best interest of the Federation and the members thereof.

Article 3, section 7(i) provides, in relevant part:

The Board or a sub-committee thereof shall be deemed eligible to hear, decide and determine all matters and questions concerning or affecting the Federation or any of its members or Locals, as well as all matters and questions in which said Federation, its Locals or members, may be interested.

This court finds as follows:

■ Summary judgment is authorized by Federal Rule of Civil Procedure 56, which states:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). "Material" facts are those facts that might affect the outcome of the suit under the substantive law governing the claims made. An issue of fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" in light of the burdens of proof required by substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 252, 106 S.Ct. 2505, 2510, 2512, 91 L.Ed.2d 202 (1986). In this case, both parties have stipulated to the finding that no genuine issue of material fact exists and that the matter should be decided on cross-motions for summary judgment. *See* Stipulation, filed October 6, 1992, approved by this court October 8, 1992. This court agrees and will decide the case on the cross-motions.

Local 77 in its second amended complaint states two causes of action. First, Local 77 alleges that pursuant to § 301 of the Labor–Management Relations Act ("LMRA"), 29 U.S.C. § 185, that the Federation violat-

ed its Bylaws in negotiating the Pamphlet B agreement. Second, Local 77 alleges that the procedure adopted by the Federation to ratify the Pamphlet B agreement was in violation of § 101(a)(1) of the Labor–Management Reporting and Disclosure Act of 1959 ("LMRDA"), 29 U.S.C. § 411(a)(1). Each claim will be addressed separately below; first the § 301 LMRA claim and then the ratification claim.

### A. The § 301 Claim

 A plaintiff bringing a § 301 LMRA claim bears the burden of demonstrating to the court that the union's interpretation of its own governing documents was "patently unreasonable." *See Local 334 v. United Ass'n of Journeymen,* 669 F.2d 129, 131 (3d Cir.1982) (noting also that the issue of patent unreasonableness is a purely legal question) (quoting *Stelling v. International Bhd. of Elec. Workers,* 587 F.2d 1379, 1389 (9th Cir.1978), *cert. denied* 442 U.S. 944, 99 S.Ct. 2890, 61 L.Ed.2d 315 (1979)). *See also Local No. 48 v. United Bhd. of Carpenters,* 920 F.2d 1047, 1052–53 (1st Cir.1990) (citing various circuit cases); *Loretangeli v. Critelli,* 853 F.2d 186, 192–93 (3d Cir.1988); *Kleppick v. Pennsylvania Telephone Guild,* 631 F.Supp. 1073, 1081 (W.D.Pa.1986). In determining whether the interpretation was patently unreasonable, the court should inquire " 'whether there was arguable authority for the officer's act from the officer's viewpoint at the time ...' " *Local 334, supra* at 131 n. 4 (citing *Stelling,* 587 F.2d at 1389, n. 10). Absent such a showing, a court should be reluctant to overturn the union's interpretation. *Local 334, supra.* In addition, a union's interpretation of its own governing documents is due a degree of deference if that interpretation is consistent with past practice. *See Loretangeli,* 853 F.2d at 195 & n. 16 (referring to various circuit cases).

█ The Federation's interpretation of its Bylaws to allow for designation of a maximum number of local musicians in the Pamphlet B productions is not patently unreasonable. This court finds that there was authority to make the designation in both the plain language of the Bylaws and the Federation's past practice. This was a reasonable interpretation, resolving the competing interests of the local and touring musicians. Local 77 points to Article 5, Sections 11, 12, and 13 of the Bylaws as preventing the Federation's actions. By its plain language, Section 11 grants locals the authority to make provisions specifying the number of musicians for any engagements performed within the local's jurisdiction in their governing documents. Traditionally these numbers have been established by either "(1) collectively negotiated agreements with employers; and (2) in the absence of such a collective bargaining agreement, by unilaterally setting those scales and minimums." Sprague decl. ¶ 6. Nothing in these provision prevents the Federation from acting to set maximums through its own collective bargaining with employers. In fact, sections 12 and 13, by their terms, are inapplicable to touring theater engagements, the subject of Pamphlet B.[1]

Local 77 acknowledges this, but asks that the court ignore the plain language of those sections. *See* Plaintiff's Motion for Summary Judgment at p. 6. Instead, Local 77 directs this court to examine how sections 11, 12, and 13 operate in practice. *Id.* Even in looking at the dynamics between the Federation and its Locals, the Federation's interpretation of its Bylaws in enacting Rule 61 does not rise to the level of patent unreasonableness. While the locals are accorded a large measure of autonomy in many matters, their functioning is in all respects subject to the superior authority

---

1. Section 12 reads:
 A local adopting minimum number of musicians laws (theatre engagements excepted) must, in order to receive the protection of the Federation, notify the International Secretary–Treasurer and all Locals within a radius of one hundred miles of its jurisdiction, by a distinct and separate notice.

 Section 13 reads:
 When the provisions of the preceding paragraph have been fully complied with by a Local, a traveling unit entering its jurisdiction is bound by the minimum number law established by the Local.

of the Federation, which granted the locals their original charters. *See* Art. 4, section 4 (requiring locals conform to Federation Bylaws). In certain areas, the Federation has a longstanding policy to negotiate collective bargaining agreements itself rather than delegating such authority to the locals. *See* Paragraphs 6 & 14 in undisputed facts *supra.* Indeed, those collective bargaining agreements in which the Federation enters bind all of its members. *See* Art. 13, section 23(a). In deciding that its Bylaws allowed the Federation to negotiate the minimums for touring theatrical musicals, the Federation did not interpret its Bylaws in a patently unreasonable way. Rather, it was a reasonable reading of the Bylaws as supported by both the plain language of the sections and its previous actions in other areas.

The Federation's interpretation of its Bylaws is consistent with past practice and procedure. For example, when Ringling Brothers Circus objected to hiring requirements unilaterally imposed by various Locals, the Federation negotiated an agreement with the Circus superseding the requirements of the Locals. Also, at the Federation's 1983 Convention, the delegates adopted Article 3, sec. 7(f) of the Bylaws, giving the Federation broad regulatory powers over matters effecting touring musicians.

Based upon these findings, the Federation is entitled to summary judgment on the § 301 claim.

### B. The Ratification Claim

■ The second claim asserted by Local 77 is that the failure to permit local musicians to vote on ratification of the Pamphlet B agreement was in violation of LMRDA § 101(a)(1). It is unnecessary to reach the merits of this claim. This claim must be dismissed without prejudice pursuant to Fed.R.Civ.Pro. 12(b)(3). Although

the Federation has advanced dismissing the claim based on Local 77's lack of standing, the court will assume *arguendo,* that Local 77 has standing.[2]

LMRDA § 102, 29 U.S.C. § 412, provides that proper venue for alleging violations such as those Local 77 has claimed is "the district court of the United States for the district where the alleged violation occurred, or where the principal office of such labor organization is located." The Eastern District of Pennsylvania is not where the principal offices of the Federation are located; those offices are in New York City, which is within the Southern District of New York. Nor is the Eastern District of Pennsylvania the district where the alleged violation occurred, since all of the actions (or omissions) that constituted the alleged violation occurred in the Southern District of New York. *Cf. Vestal v. International Bhd. of Teamsters,* 245 F.Supp. 623, 624–26 (M.D.Tenn.1965). The violation at issue in Local 77's complaint is that the procedure adopted to ratify Pamphlet B violated the LMRDA. Local 77 argued that the implementation of Pamphlet B in Philadelphia constituted the violation. The implementation, however, is the result of the violation rather than the violation itself. This court, therefore, must look at those events of the ratification procedure to determine where the violation occurred. Here, those events include: the meeting of the International Executive Board to determine of who would be permitted to vote on the Pamphlet B ratification; the International's transmission to the American Arbitration Association of instructions for the mailing of ratification ballots; and every act or omission with respect to the mailing, receipt, and tabulation of those ballots by the AAA. All of those events occurred in New York City. There was no contact with the Eastern District of Pennsylvania.

---

**2.** The issue of whether Local 77 has standing under §§ 101 and 102 is arguable. *Compare United Bhd. of Carpenters Local No. 267 v. Ohio Carpenters Health & Welfare Fund,* 926 F.2d 550, 554–56 (6th Cir.1991) (holding that local unions are not members protected under § 101 and did not have standing under § 102) *with Local No.*

*1, Broadcast Employees v. International Bhd. of Teamsters,* 419 F.Supp. 263, 271–72 (E.D.Pa. 1976) (Becker, J.) (concluding that a local union is a person for purposes of § 102 and a member of a labor organization as that term is used in § 101).

Although venue is proper with regard to the § 301 claim, venue must be proper for each claim in a case with multiple claims. This is especially true in a case such as this one where the claim is brought pursuant to a subsection of the LMRDA, which has a specific venue provision. *See DiMiceli v. National Marine Engineers Beneficial Ass'n*, 500 F.2d 31, 32 (9th Cir. 1974) (requiring that a complaint assert a violation of 29 U.S.C. § 411 before § 412's venue provisions will be used). The exceptions where venue need not be proper for all claims do not apply here.[3]

Summary judgment is entered against the Plaintiff; judgment for the Defendant, for the § 301 claim. The ratification claim is dismissed without prejudice.

### JUDGMENT

AND NOW, this 2nd day of December, 1992, upon consideration of Plaintiff's Motion for Summary Judgment, Defendant's Motion for Partial Dismissal and for Summary Judgment and a hearing, it is hereby ORDERED that Plaintiff's Motion for Summary Judgment is DENIED and Defendant's Motion for Summary Judgment is GRANTED for the reasons stated in the foregoing Memorandum. Judgment is entered in favor of the Defendant and against the Plaintiff with regard to the LMRA § 301 claim.

---

**3.** Such exceptions include: one, cases in which the claims are parts of the same cause of action; and two, cases in which "pendent venue" exists, that is where claims arise out of the same operative facts. *See Klauder & Nunno Enterprises, Inc. v. Hereford Assoc., Inc.*, 723 F.Supp. 336, 341 (E.D.Pa.1989) (Cahn, J.); *Max Daetwyler Corp. v. Input Graphics, Inc.*, 541 F.Supp. 115, 117–18 (E.D.Pa.1982) (Pollack, J.). Here, the fact that each of Local 77's claims are based on separate statutes, the LMRA and the LMRDA (both of which sanction different kinds of conduct and offer different remedies), suggests that neither exception applies in this case.